<u>Declaration of Tracy Beth Høeg, MD, PhD</u>

I, Dr. Tracy Beth Høeg, declare as follows:

1.      I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education and experience.

2.      I earned a Bachelor of Art in French with Honors at the University of Wisconsin-Madison in 2001. I received a Doctor of Medicine (M.D.) degree from the Medical College of Wisconsin in 2006, and a PhD in Epidemiology and Public Health from the University of Copenhagen in 2014. I completed my residency training (including service as a Chief Resident) in Physical Medicine and Rehabilitation (PM&R) at the University of California Davis in 2018, and a fellowship in Sports Medicine and Interventional Spine Medicine at the Bodor Clinic in 2019.

3.       Currently, I am a practicing PM&R Physician in Grass Valley, a California-based clinic. In conjunction with this, I also treat patients at Sacramento Surgical Institute, LLC, in Folsom, California.

4.      Additionally, I work as a Clinical Researcher at Acumen, LLC.

5.      I am also employed by the Florida Department of Health as a consultant epidemiologist and am currently doing voluntary epidemiological consulting with Marin County Health and Human Services.

6.      I am a citizen of Denmark and the United States and have active medical licenses in both California and Denmark.

7.      I have <u>testified</u> before Congress about COVID-19 in children.

8.      I am a senior or first author of nine published epidemiological analyses of the COVID-19 pandemic, six of which have been published in peer-reviewed journals, with the remaining three currently in pre-print version.

9. The COVID-19 studies I have been a co-researcher on have explored a number of topics, including the disease's transmission in schools, effectiveness of mask mandates, and risk-benefit analyses of COVID-19 mRNA vaccines in children and young adults.

10. As a PM&R sports medicine and spine medicine physician, I see patients with a wide variety of complex health problems. I have worked for years to develop trusted relationships with my patients. I believe one of the reasons my patients place deep faith in me is that I am honest and transparent about their diagnoses, prognoses and potential treatments, and because prior to arriving at my recommendations, I take the time to thoroughly review the relevant scientific literature.

11. Remaining up to date on the current scientific literature and analyzing the studies' methodologies and results is essential to the practice of medicine. We have learned through continued scientific inquiry that many treatments previously considered effective (surgeries, medications, etc.) actually may either not work as intended or, in some circumstances, cause more harm than benefit. The same goes for many types of diagnostic testing. Further, that many physicians are recommending a treatment does not necessarily mean it is backed by robust medical evidence or that we may not eventually learn the treatment is not indicated. Progress in medicine relies on continuously challenging our current beliefs.

12. Physicians should know the "truth" is not set in stone, but rather we have the opportunity to come closer and closer to a true understanding of both diseases and medical interventions through continuous investigation using, for example, robust epidemiological analyses and randomized controlled trials for interventions. Indeed, it is the duty of every physician to remain informed of the most recent medical literature and potentially practice-

changing discoveries that could save or improve lives. It is also their job to admit uncertainty where high-quality evidence is lacking.

13. The way the bill is worded, it will likely lead physicians to self-silence new data that may not be entirely aligned with "the consensus." Physicians who may be ahead of the curve or rapidly adopt new data into patient care may be unjustly punished. Alternately, physicians may feel pressure to state there is "a consensus" when there is none and those expressing appropriate nuance and uncertainty could be punished.

14. I am going to give a few examples of the above, incorporating a number of my own research projects.

15. I was the senior author on a seminal study on school transmission of COVID-19 published with the Centers for Disease Control (CDC) in their journal, Morbidity and Mortality Weekly (MMWR), and know first-hand the CDC was very slow in adapting their recommendation to the findings of our study and other studies in the US and internationally about the very low rate of in-school COVID-19 transmission, even at times of high community disease prevalence and no measurable effect on community disease levels.

16. Had AB 2098 been in effect during the fall or winter of 2020-2021, a physician who advocated for, by discussing openly with their patients, the reopening of K-12 schools could have faced consequences in California under AB-2098. And silencing those physicians may have led to an even longer delay in the reopening of public schools in California and additional negative impacts on children's education and well-being.

17. Another controversial topic has been the masking of children. While the CDC and American Academy of Pediatrics (AAP) recommended masking of children ages 2 and above to prevent the spread of SARS-CoV-2, the European Centers for Disease Control (ECDC)'s stance

has been to only <u>recommend</u> mask wearing for children over 12 in schools. The World Health Organization (WHO) <u>did not recommend</u> masking for children under five years old, specifically stating, "Children of this age should not wear masks for a long duration."

18.     Many countries, (<u>including Denmark</u> where I hold citizenship, Sweden and Norway) never recommended masking children under the age of 12. Though there may have been the appearance of "consensus" in some locations, there was no international consensus on this issue, reflecting a difference of values in the face of a lack of robust evidence. Would a physician under AB-2098 risk losing their license for expressing nuance about an issue such as masking children for which international consensus is lacking?

19.     My <u>own research</u> <u>has failed to find</u> that masking children in schools had a detectable effect on SARS-CoV-2 disease transmission. One of these studies, which I published along with Economics professor at the University of Toronto, Ambarish Chandra, PhD, reanalyzed a very influential school mask mandate study published by the CDC, but our findings reversed theirs with the use of a larger cohort and longer duration study periods and was published in the highly-respected Journal of Infection. This demonstrated that with more robust epidemiological analyses, we can learn that what initial small studies apparently indicated might have been spurious and/or confounded and inappropriate bases for public health recommendations. As we are lacking randomized controlled trials of masking children, it is possible our understanding of this topic may continue to evolve. Thus, it is inappropriate to say that it is "settled science" that masking children 2 and above is effective at preventing the spread of SARS-CoV-2. Yet, under AB-2098, conceivably physicians could be penalized for saying as much.

20.     Likewise, a patient may want to know the effectiveness of community surgical mask wearing.  The two highest quality evidence studies we have (randomized controlled trials

from Bangladesh and Denmark) found no detectable benefit to those under 50 years old. The overall 11.1% effectiveness of surgical masking detected in Bangladesh, which was significant only in those 50 and over, may have actually been the result of statistically significant imbalances between the intervention and placebo groups, as was eloquently described in this peer-reviewed reanalysis, rendering any inference that the masks *caused* the 11.1% reduction inappropriate. There was no detectable benefit to the wearer of surgical masks in the randomized study from Denmark. In other words, we currently lack robust evidence that cloth or surgical community mask wearing effectively limit the spread of SARS-CoV-2.

21. A generic statement that "masks work" at the very least obscures these findings, and in reality, simply does not reflect the current state of scientific knowledge. Yet, I do not know if providing more nuanced but more accurate information may run afoul of the "scientific consensus," as interpreted by the Medical Board. This puts a physician in a difficult position.

22. Living in this persistent uncertainty about what one is allowed and not allowed to say makes practicing medicine ever-more challenging for physicians who truly want to give their patients full and honest information and simply do the best for them—as all physicians are ethically and legally obligated to.

23. Another issue specifically addressed in the bill is COVID-19 vaccination. The recommendations for vaccinating and boosting children against COVID-19 currently vary internationally. Multiple European countries, including Sweden, Denmark, Norway and Finland are only recommending fall bivalent booster doses for those over 50-65 years or otherwise considered to belong to a high-risk group. The European CDC and European Medicine Agency has released a joint statement saying the updated boosters should be "directed as a priority" to those 60 years and older or high risk groups. Denmark has specifically stated children (under 18)

cannot get vaccinated against COVID-19 unless they have a medical evaluation from a physician who deems it advisable.

24. In the US, the new bivalent booster is recommended for all children 5 and over if it has been 2 months since their last infection or vaccination. Simply put, we are currently in a situation where there is no international consensus on this issue and new <u>data from my own research group</u> found that the risk benefit ratio for vaccinating people 18-29 with a booster dose may be on average unfavorable when weighing COVID-19 hospitalizations prevented against serious adverse events and the risks of post-vaccination myocarditis. In this instance, following the so-called "consensus" could lead to unnecessary harms.

25. The benefits and risks of the new bivalent booster in each age demographic and those with compared to those without prior infection are currently not well-defined. This puts physicians who are simply trying to give appropriate and individualized recommendations in a difficult position, particularly considering they may not know what the California Medical Board's "consensus" is at the moment or if it also evolves as our understanding evolves.

26. Further, as the virus mutates and population immunity increases, we <u>have seen</u> vaccine effectiveness decrease in a way that has been difficult to predict and continues to rapidly change. We have also gained knowledge about the <u>likelihood</u> of severe adverse reactions to the COVID-19 vaccines, as well as <u>long-term implications</u> of post-vaccination myocarditis.

27. This new information has changed and continues to change the risk-benefit calculations for each age, sex, and underlying health status demographic and for each dose of vaccination. A generic statement such as "the COVID-19 vaccine works" simply does not account for the complexity of the risk-benefit calculus. Such a statement is the opposite of individualized

medicine. Indeed, we physicians have a duty to give accurate information to our patients yet, under AB-2098, we may not have the freedom to do so.

28.     Additionally, the bill itself ironically contains demonstrably false information about COVID-19 vaccine effectiveness. The bill states "Data from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated."

29.      However, the CDC's own website states it is 6 times greater. And even this statistic should be tempered with the fact it relies on observational data, meaning it does not consider baseline differences in health between vaccinated and unvaccinated which would likely change this number. In short, the 11 times risk reduction in the bill is demonstrably false, but presumably a physician could punished for stating a different number that conflicts with the legislature's (demonstrably false) position.

30.     Because my primary duty is and will always remain the well-being of my patients, I will most certainly continue to tell them the truth about their conditions and treatments to the best of my ability. Nevertheless, since the passage of AB 2098 I have found myself in a difficult position. I am afraid of saying something to my patients that I know is consistent with the current scientific literature but may not yet be accepted by the California Medical Board. Physicians must feel free to speak truthfully with their patients if they wish to gain and maintain their trust.

31.     As there is also no international consensus on many of these issues, legislating the concept of a "scientific consensus" in light of our evolving understanding outlined above is misguided and unworkable.

32.      In response to the controversial nature of my published research described above, physicians online have *already* threatened to report me to the California Medical Board multiple

times. Some of these threats specifically and pointedly referred to the then-anticipated passage of AB 2098. Some threats have followed the passing of the bill to law.

33. Because of the personal attacks and threats, I have grown fearful that decoy patients are being sent to me simply to ask controversial or difficult questions with the intent of reporting me. This fear is interfering with the sacred doctor-patient relationship that I and so many other physicians value so greatly.

34. Although I realize that speaking out against this law comes at a great personal risk to me, I am writing this declaration out of respect for my patients and for the people of the state of California.

35. I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: 10/31/2022

Signature _tracy hoeg_