Declaration of Ram Duriseti, MD, PhD

I, Dr. Ram Duriseti, declare as follows:

1. I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education and experience.

2. I am a practicing Emergency Physician. I have worked in both Community and Academic high-volume settings as an attending physician for 22 years. I completed my Bachelor of Science and Bachelor of Arts degrees at Stanford University in 1991. I received my Doctor of Medicine (M.D.) degree from the University of Michigan Medical School in Ann Arbor in 1996 with highest honors and was elected to the Alpha Omega Alpha Medical Honor Society. In 2007, I received a PhD in Engineering from Stanford University. My dissertation and subsequent research and publications focused on computational modeling of complex decisions and, in particular, optimizing complex medical decisions.

3. I have been a practicing attending Emergency Physician since 2000 with the Stanford Department of Emergency Medicine and at Mills-Peninsula Hospital in Burlingame and became a Diplomate of the American Board of Emergency Medicine in 2001. At Stanford Hospitals and Clinics, my focus is Pediatric Emergency Medicine.

4. I am a volunteer with an organization called [Urgency of Normal](). The organization is a group of physicians, researchers, children's advocates who have developed analyses and "toolkits" to help facilitate safe school openings and return to normalcy for children after extensive national disruptions since March 2020. We emphasize the use of data and supporting literature. [I have provided the organization with extensive analysis from primary CDC COVID-related data](). I have published and/or have pending several studies on COVID-related issues including a numerical

paper analyzing Emergency Department utilization disparities in access during COVID[1], formal methodological comments on COVID-related journal articles[2], have a publication pending[3], have a manuscript in progress re-analyzing a Mask RCT using random effects regression combined with Monte-Carlo methods,[4] have a manuscript in progress with an econometrics team at Ljubljana University in Slovenia,[5] am working with a Bay Area County Public Health department designing and implementing statistical analysis software ("R-package") to process the County's COVID data with a plan to publish our analysis of their data[6], and will be embarking on a funded research project to examine surgical mask and N95 filtration efficacy for sub-micron aerosols (where most viable infective virions live) with collaborators at a Canadian University.[7] I have also authored and co-authored OpEds on COVID policy matters[8,9], have testified before the California State Legislature Health Committee and have met with various State Senators about COVID policy.

5. Since March of 2020 (and likely earlier), I have treated hundreds of COVID patients. Over the last three years, I have read and analyzed hundreds of journal articles on COVID and related topics, co-authored academic analyses of COVID mitigation policies and their impacts and written multiple evidence-based expert declarations on COVID related topics submitted to national courts.

---

[1] https://pubmed.ncbi.nlm.nih.gov/34125026/
[2] https://publications.aap.org/pediatrics/article/doi/10.1542/peds.2022-056687/185379/School-Masking-Policies-and-Secondary-SARS-CoV-2  and
https://publications.aap.org/pediatrics/article/149/6/e2022056288/185413/Integrating-SARS-CoV-2-Antibody-Results-in?
[3] Child mask mandates for SARS-CoV-2: A systematic review" co-authored by invitation and under review by a peer-reviewed journal
[4] Manuscript in progress with JD Haltigan, PhD and Kim Colyvas, MS
[5] European Bank funded project analyzing the economic impact and benefits of NPIs in the European Union. Senior author Velimir Bole, PhD.
[6] County-specific information can be provided upon request if information is kept under seal
[7] Name of University and collaborating researchers can be provided upon request if kept under seal
[8] https://www.newsweek.com/were-physician-mathematician-data-scientist-n95s-wont-work-kids-opinion-1672207
[9] https://www.newsweek.com/we-need-stop-indiscriminately-testing-covid-its-harming-our-kids-opinion-1699723

6. Treating patients involves communicating with them and making judgments about treatment that are based on a patient's individual circumstances, and the physician's knowledge and expertise acquired during clinical, educational, research, and professional experiences. Treating COVID patients is no different.

7. As a doctor, I am well aware that the term "scientific consensus" is problematic and represents a misunderstanding of the scientific process itself.  First, what is considered "consensus" one day may turn to be the wrong approach. There are innumerable examples in a wide variety of medical domains, but I will proceed to provide several examples as they pertain to COVID.

8. For example, at the beginning of this pandemic, severe COVID patients were subjected to early intubation as a means to "protect health care workers,"[10] but as scientific knowledge and understanding of the disease evolved, we have moved away from invasive ventilation as a primary intervention. When the "consensus" was still settled on intubation, I put my patients' well-being first and advocated for non-invasive ventilatory support whenever clinically safe and feasible. Though my approach later proved to be correct, because at the time that I administered this treatment it was contrary to "consensus" my clinical advocacy could have been subject to professional sanctions had AB2098 been the law.[11]

9. Second, consensus can vary depending upon the group authorized to set a policy. Professionals who dissented from government health officials have been silenced and some platformed experts who are vocal about what they deem to be misinformation may not be as informed on the topics in question as those they consider misinformers. Put otherwise, there has

---

[10] https://www.wsj.com/articles/hospitals-retreat-from-early-covid-treatment-and-return-to-basics-11608491436
[11] https://economictimes.indiatimes.com/industry/healthcare/biotech/healthcare/as-virus-advances-doctors-rethink-rush-to-ventilators/articleshow/75401919.cms?from=mdr

frequently been a perception of consensus on prevention and treatment of COVID that does not actually exist or is actively in flux (e.g., efficacy of cloth masks).

10. Likewise, knowledge of efficacy of treatments for Covid-19 is constantly evolving.

11. While I have *never* recommended Ivermectin or Hydroxychloroquine to a COVID patient in opposition to established recommendations at the time, few are aware that the FDA initially granted an EUA for Hydroxychloroquine for COVID in March 2020[12] or that there is an active NIH funded randomized controlled trial (RCT) looking at a longer and higher dosing regimen of Ivermectin to treat COVID.[13]

12. Remdisivir, a proprietary drug from Gilead Pharmaceuticals that we still use in hospitalized COVID patients, received an FDA EUA in May 2020 and final approval in October 2020. And yet not many—including physicians and other experts—know that the largest RCT of Remdisivir from the WHO demonstrated no beneficial effect.[14]

13. This is all to say, after less than three years of dealing with Covid-19, there are many unknowns, and the "consensus" at any given moment may turn out to be incorrect (sometimes within months).

14. While there is no doubt that the COVID vaccines have saved lives in immune naïve individuals at notable risk of severe disease, the knowledge of both the benefits and risks posed by vaccines has continued to evolve. For example, until June 2021, the "consensus" was that individuals vaccinated against COVID were not capable of spreading the virus and that myocarditis was not a known complication of COVID mRNA vaccines. On both accounts the "consensus" quickly proved incorrect. Indeed, as was noted during the December 2020 VRBPAC

---

[12] https://www.fda.gov/media/136534/download
[13] https://activ6study.org/study-results/
[14] https://www.nejm.org/doi/full/10.1056/nejmoa2023184

meeting, it turns out that any "consensus" on transmission reduction could not have emerged from the trial.[15]

15. Now 2 years later, is now widely acknowledged that while there are clear benefits to COVID vaccines for at risk individuals, they do not eliminate transmission and may only transiently mitigate transmission risk. Furthermore, both contemporaneous and subsequent data has confirmed that COVID vaccines have a quantifiable risk of myocarditis.[16] As a physician-scientist who meticulously read the Pfizer clinical protocol[17] and the subsequent EUA submission[18] (including severe outcomes data on page 31), reviewed the December 2020 VRBPAC transcription discussing evidence of transmission reduction[19], stayed informed on the international post-vaccination infection data and performed an unpublished numerical analysis of VAERS data in May of 2021 for my benefit and that of my family *and friends who asked for my opinion*, I understood these risks earlier than many others.  However, had AB2098 been in effect at the time, I could have been accused of spreading "misinformation" subject to investigation and professional sanctions had I shared my early accurate understandings with any patients.

16. AB2098 will preclude me from properly and freely communicating with and treating my patients according to my best judgment because it places me in jeopardy of being reported for potentially giving a patient advice that doesn't match the "consensus" of the day, even if it is later shown that the "consensus" was incorrect. Indeed, as evidenced below, proponents of the bill appear intent on stifling even academic debate and are willing to engage in personal attacks to meet this goal. Even if no formal sanction is imposed, the process itself involves significant costs

---

[15] https://www.fda.gov/media/144859/download  (page 342)
[16] https://www.science.org/content/article/israel-reports-link-between-rare-cases-heart-inflammation-and-covid-19-vaccination
[17] https://cdn.pfizer.com/pfizercom/2020-11/C4591001_Clinical_Protocol_Nov2020.pdf
[18] https://www.fda.gov/media/144245/download
[19] https://www.fda.gov/media/144859/download (page 342)

and reputational harms, including having to report being subject to this process to every other licensing authority and any hospital where privileges are being renewed or newly sought.

17. There is no precedent for a law that prevents doctors from communicating openly with their patients and giving what they believe to be the best possible advice for their circumstances.

18. Unfortunately, there are physicians who are vocal AB 2098 advocates, who have publicly threatened me and others (especially other Urgency of Normal doctors and/or my research collaborators) by implying that they will negatively impact our professional standing (*See* Attachments A and B).

I swear or affirm under penalty of perjury that the foregoing is true and correct.



_____

Dated:  October 20, 2022