## **DECLARATION OF DR. AARON KHERIATY**

I, Dr. Aaron Kheriaty, declare as follows:

1. I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education, and experience.

2. I completed my undergraduate studies at the University of Notre Dame and earned a Bachelor of Arts degree with a double major in philosophy and pre-medical sciences in 1999. I earned my Doctor of Medicine (M.D.) degree from Georgetown University in 2003 and completed residency training in psychiatry at the University of California Irvine. For many years, I was a Professor of Psychiatry at UCI School of Medicine and the Director of the Medical Ethics Program at UCI Health, where I chaired the ethics committee. I also chaired the ethics committee at the California Department of State Hospitals for several years. I am now a Fellow at the Ethics & Public Policy Center in Washington, DC, where I direct the program on Bioethics and American Democracy. I am also chief of psychiatry and ethics at Doc1 Health and chief of medical ethics at The Unity Project. I am a senior fellow and director of the Health and Human Flourishing Program at the Zephyr Institute. I serve as a scholar at the Paul Ramsey Institute and on the advisory board at the Simone Weil Center for Political Philosophy.

3. In addition to publishing several peer-reviewed medical and bioethics papers, I have authored numerous books and articles for professional and lay audiences on bioethics, social science, psychiatry, religion, and culture. My work has been published in the Wall Street Journal, the Washington Post, Arc Digital, The New Atlantis, Public Discourse, City Journal, and First Things. I have conducted print, radio, and television interviews on bioethics topics with The New York Times, the Los Angeles Times, CNN, Fox News, and NPR.

4. During the early months of the Covid-19 pandemic, I co-authored the University of California's pandemic ventilator triage guidelines for the University of California's ("UC") Office of the President and consulted for the California Department of Public Health on the state's triage plan for allocating scarce medical resources. In early 2021, when the demand for vaccines outstripped supply and there were ethical questions about who should get the vaccines first, I was involved in developing the UC vaccine-allocation policy. I also served as a psychiatric consultant at the UCI hospital and, in connection with treating patients at the hospital, I contracted Covid-19 in 2020. I am now in private practice as a psychiatrist in California where I continue to treat patients.

5. AB 2098 will harm patients, hamstring our pandemic response, destroy the trust necessary for the doctor-patient relationship, and worsen the physician shortage in California. Most egregiously, the bill violates the First Amendment free speech rights of physicians.

6. A physician with a gag order – a physician who cannot say what he or she thinks – is not a physician that can be trusted. Patients want to know that if they ask their physician a question, including a question about Covid, they will get their doctor's honest opinion—regardless of whether the patient follows that opinion, seeks a second opinion, declines to act on that opinion, etc. Patients will not trust physicians if they believe their doctor is simply parroting a consensus judgment that he or she may or may not endorse.

7. Science evolves constantly: the text of AB 2098 makes three statements about Covid and Covid vaccines that are already outdated:

(1) The death count figures cited are overestimated by failing to distinguish dying *from* COVID and dying *with* Covid;

(2) the efficacy of vaccines has declined with time and new variants, so the vaccine efficacy statistic cited in the law is no longer true of the vaccines against Omicron variant;

(3) new COVID vaccine safety issues have come to light with emerging research.

8. Safety and efficacy findings are subject to change over time. For example, a study in the *New England Journal of Medicine* showed *negative vaccine efficacy* against the Omicron variant. Another recent peer-reviewed study found reduced sperm counts in men after vaccination, and yet another study revealed that mRNA is excreted in the breastmilk of lactating women, raising safety concerns for nursing newborns. These findings were unavailable when this law was drafted. Physicians should be able to share these concerns with their patients.

9. Advances in science and medicine typically occur when doctors and scientists challenge conventional thinking or settled opinion. Fixating any current medical consensus as "unassailable" by physicians will stifle medical and scientific progress. As I testified in January at a U.S. Senate panel on Covid policy: "The scientific method suffered [during the pandemic] from a repressive academic and social climate of censorship and silencing of competing perspectives. This projected the false appearance of a scientific consensus—a 'consensus' often strongly influenced by economic and political interests."

10. Over the last two years public health recommendations and "consensus" with respect to Covid changed frequently as new information became available. Frontline physicians played a key role here in advancing knowledge of COVID treatments—including changing guidelines on ventilating patients, the use of high dose steroids in hospitalized patients, and identifying previously unknown or overlooked safety issues with some novel antiviral therapies. As with the rest of medical science, *yesterday's minority opinion often becomes today's standard of care.*

11. Good science is characterized by conjecture and refutation, lively deliberation, often fierce debate, and always openness to new data. AB 2098's censorship of free inquiry and free speech spells not only the demise of civil liberties and constitutional rights for physicians in CA, but the end of the scientific enterprise when it comes to dealing with covid in my home state.

12. Physicians who are negligent and commit malpractice (for example, a doctor who advises a patient to inject himself with bleach to treat COVID) are already subject to tort lawsuits and disciplinary actions by the medical board under existing state law. For example, under existing law the Board is already empowered to investigate, and if necessary, take enforcement actions against "any physician and surgeon where there have been any judgments, settlements, or arbitration awards requiring the physician and surgeon or his or her professional liability insurer to pay an amount in damages in excess of a cumulative total of thirty thousand dollars." Cal. Bus. & Prof. Code § 2220(b).

13. Given the already broad powers of the Board, AB 2098's real purpose is to silence doctors who disagree with the public-health establishment on controversial subjects on which there is ongoing substantial disagreement and debate – thus constraining these physicians' free speech rights.

14. AB 2098's provisions are vague and do not provide sufficient guidance to doctors with respect to what information can and cannot be shared with patients. For example, it provides no meaningful definition or operational criteria to determine the "current scientific consensus," which as already discussed may be rapidly changing. Indeed, the Governor of California himself recognized this problem when, while signing the AB 2098 into law he attempted to limit its reach by directing the Board to punish only "those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care while interacting directly

with a patient under their care." Whether the Board will or won't follow Governor Newsom's exhortations remains to be seen, but in the meantime, physicians will have no way of knowing whether a statement to a patient, even one based on recent peer-reviewed scientific studies, will draw scrutiny from the Medical Board for challenging the public health establishment's preferred policy goals. The law will thus have a chilling effect on the speech of not only the doctors who are charged or disciplined under the law but all physicians in California who advise patients on COVID-related matters.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated:  October 18, 2022                                          Signed: /s/ *Aaron Kheriaty*