I, Dr. Azadeh Khatibi, MD, MS, MPH, declare as follows:

1. I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education, and experience.

2. I am a board-certified, fellowship-trained physician. I received my Bachelor of Science at University of California, Los Angeles, with a major in Molecular, Cell, and Developmental Biology in 2001. I graduated *Phi Beta Kappa* with Departmental Honors and College Honors.

3. I entered medical training as one of twelve students in the UC Berkeley-UC San Francisco (UCSF) Joint Medical Program. I received my medical degree from UCSF in 2007. I also obtained a Master of Public Health (MPH) degree in 2003, and another masters in Health and Medical Sciences in 2004, both from University of California, Berkeley.

4. After graduating from medical school, I completed an Internal Medicine internship at Alameda County Medical Center in affiliation with UCSF. I completed my residency in ophthalmology at the University of California, Irvine, where I was selected to be Chief Resident. I completed fellowship in Vitreo-Retinal Disease and Surgery at University of California, San Diego, where I received the Outstanding Teacher Award both years of my training.

5. I have cared for numerous patients with infectious disease. I have discovered and named a disease and published scholarly articles in peer-reviewed journals. I've worked both in private practice and as a doctor providing care for patients in a large health maintenance organization. I have been licensed by the Medical Board of California since 2009. I have never had a complaint or been investigated by any medical regulatory body.

6. I am also a patient. I had a serious life-threatening illness, and was given a 25% chance of being alive in five years. I also have immune system issues as a result of this illness.

7. AB 2098 declares it "unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19…" The bill further defines "misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."

8. In medical terms "consensus" refers to the general opinion of a group of doctors. There is informal consensus opinion among doctors, and also formal consensus opinion, where a group of doctors with expertise in a particular topic come together to amass, discuss, and debate the evidence around a topic, arrive at some conclusions for general patient care guidelines and publish them. Even in this formalized setting, not all participants may agree with the ultimate conclusions and recommendations in whole or in part.

9. The process of creating formal consensus guidelines for publication involves disagreement between doctors. In fact, "disagreements [in developing consensus guidelines] can shed light on areas of controversy and launch further discussions."[1] It is natural and normal for doctors to disagree on what is best for individual patients, or even groups of patients.

10. In fact, medical advancement starts with questioning and exploring beyond, and sometimes against, consensus opinion. In free societies throughout modern history, doctors have had the liberty to contradict both informal and formal consensus in treating their individual patients, whose cases may not be suitable for conforming to general guidelines or may not align with methods and outcomes of particular studies.

11. Furthermore, consensus—whether formal or informal—is always catching up to the latest emerging evidence or thought frameworks, and thus is always behind the cutting edge. Indeed, the best studies that are accepted for publication in the top reputable medical or scientific journals are often ones that provide new information, either beyond or contrary to the accepted knowledge. AB 2098 does not define "consensus," nor does it account for the fact that consensus lags behind the latest emerging evidence or thought framework. This creates serious problems for doctors who know that newer studies and thought frameworks provide information and guidance that may be useful to their patients, and also know that they may face legal investigation and punishment if this information differs from "consensus," but they present it to their patients anyway.

12. The limitations that AB 2098 places on physicians is contrary to the ethical duties inherent in medical practice, because ethical practice of medicine sometimes requires questioning and disagreeing with consensus.

13. During my time as a physician and as a patient, my doctors and I took the approach that was the opposite of "consensus" opinion, including formal published consensus, multiple times. It is because my doctors and I chose, in treating my specific case, to proceed in a different way than "consensus" would dictate, that I believe I am alive today.

14. As may be discerned from the above, this is extremely personal to me. When I was diagnosed with a life-threatening condition and given only a 25% chance of surviving five years, my doctor and I went against the "scientific consensus" in creating my treatment plan. The "consensus" opinion and standard of care among the doctors in multiple specialties was that I should avoid a very aggressive treatment.

15. Even after getting multiple consultations inside and outside my health system, only one outside doctor, whose speech about treatments and therapies he offers does not always track the "consensus" medical opinion, suggested a very aggressive therapy. After hearing his medical opinion, I decided against the "consensus" recommendation and opted for the most aggressive, "non-consensus" treatment protocol recommended by him.

16. I am happy to report that not only did I live, but my results were remarkable, to the surprise and delight of all my doctors. Other doctors were eager to find out my protocol when they realized I was doing so well. Ironically, my original doctor (who recommended "consensus" treatment) remarked they may now try more aggressive therapies on other patients, in hopes they, too, may have a better chance of staying alive.

17. If the lone doctor had been afraid of getting investigated or having his license revoked for suggesting a "non-consensus" opinion, I wouldn't have heard about options for aggressive treatment. Had my doctor's speech been chilled to only advise and offer "consensus" treatments, I might not be alive today. Moreover, the medical advancements that come from noticing my excellent results and then applying it to others would have never happened.

18. Doctors and I also bucked formal medical consensus opinion published by an expert panel when we pursued laboratory tests for myself and a family member. The results of the lab testing, which may not have occurred had the doctors feared punishment for going against published consensus, bore life-changing results.

19. In my own medical practice, when I was a fellow at University of California, San Diego, I went against group "consensus" standards, including that of my supervising physicians at the university and surrounding areas. At the time, the majority of the doctors in my city were prescribing antibiotics after intravitreal injection. I determined, based on emerging evidence, my own lab research on injections, and knowledge of antibiotics and resistance, that giving antibiotics after eye injection was likely causing more harm than good, so I stopped routine antibiotic usage with my patients and advised them against it.

20. All around me, doctors were doing the opposite —I was alone in my treatment recommendations. Finally, months later, at a university conference, one of the attendings physicians brought up this issue, and the physicians agreed as a group that they would no longer give antibiotics after injections.

21. I mentioned at the meeting that I hadn't been giving antibiotics for months. I was ahead of the pack. If there had been a law that said with regard to ophthalmology or eye injections (as there is with AB 2098 and Covid-19) that I must only follow consensus standards of care, I would have been fearful of adopting this "non-consensus" approach, with worse results for my patients, and other patients as well.

22. I became concerned about self-censoring by my fellow physicians starting in Spring 2020, and this concern has steadily grown over the past several years. A number of my colleagues have confided their views to me, agreeing that censorship is a problem, that the situation has gotten "crazy," "ridiculous" and "bizarre," that they are afraid to speak out, and that they are glad that I am speaking up and support me in doing so. Among my physician colleagues and in the medical system more generally, I have observed hesitancy, fear, and emotional dysregulation around Covid-19 and speech.

23. My own doctor told me that she feels as though she's practicing under "communism".

24. Furthermore, she refused to write a school letter stating medical facts and her assessment—something doctors do for patients all the time for other illnesses—about skin infections caused by masking, saying that she does not "get involved in politics." Doctors who don't agree with certain medical conclusions or messaging by governmental institutions, professional organizations, certain mainstream news narratives, or their own employers, are afraid to speak out lest they lose their jobs or get harassed or investigated.

25. I, myself, was threatened by someone on social media, who stated "I will take great pleasure in seeing #AB2098 become law and seeing your license to practice medicine in California gone!" The situation is toxic to free speech, and to medicine.

26. In conversation with me, a member of the Medical Board of California confirmed that it was the Board itself that crafted the particularly broad problematic legislative language. At the same time, this individual could not explain why the Board chose the term "consensus" instead of, for example, "evidence-based medicine"—a term with known meaning, one that encompasses both majority and minority opinions, and that describes how medicine should be practiced.

27. The Board member also confirmed that the Board holds different doctors to different practice standards based on their individual circumstances. In the context of AB 2098, this is concerning because this practice gives the government authority to differentially police speech of individual doctors. This practice opens the door to labeling certain doctors as holding "non-consensus" opinions based on nothing more than vague and loose definitions and standards that the Board may determine on whatever basis it chooses. This lack of standardization will allow the Board to preferentially target doctors who hold opinions the government and its institutions disagree with.

28. With the enactment of AB 2098, the state becomes the arbiter of who is allowed to say what and to what extent. Furthermore, this variability in the government limiting physicians' speech on a case-by-case basis based on their own definitions and standards further chills speech of all physicians as a whole, because physicians will be afraid to speak lest they exceed what the government deems as appropriate speech for their specific cases. This leads to large-scale self-censoring.

29. In medical ethics, doctors are required to have a fiduciary relationship with each patient and act on principles of beneficence and non-maleficence. AB 2098's coercing doctors to conform their speech to only the state's ill-defined "consensus" determinations would affect doctors' ability to practice medicine ethically. If they feel coerced to not state their true medical opinion with their patients, then they are no longer acting as their patient's fiduciary. This is highly unethical.

30. With AB 2098 in place, doctors disagreeing with what they perceive as the general informal "consensus," or even formal published "consensus" opinion, will not feel free to state their medical opinion because they will be afraid of being investigated or losing their license. Medical Board investigation can be a long, drawn-out, multi-year, exorbitantly expensive process, and may ruin a physician's reputation irrespective of the ultimate outcome. These investigations put tremendous stress on doctors and their families, take time and attention away from patients, as well as put a financial toll on doctors from legal fees. Rather than subject themselves to the possibility of being investigated, most doctors will limit their speech about Covid-19. We cannot make it illegal for doctors to speak against consensus when it comes to Covid-19.

31. As a patient with immune system issues, AB 2098's language around "consensus" directly interferes with my right to hear opinions about Covid-19 based on my doctors' real unfiltered medical judgment. I rely on my doctors to give me their true medical opinions. Since this law coerces them to limit their speech so as to conform to some ill-defined "consensus," I will lose access to their true medical opinions. I will no longer be able to trust my doctor's speech because I will not be confident that I will be getting a true medical opinion, instead of a fear-based medical narrative acceptable to the government.

32. Lastly, AB 2098 impedes scientific curiosity, questioning, openness and investigation, which require free speech. Consequently, I and other patients no longer have access to speech that would advance medicine. AB 2098 would thus stunt medical free-thinking, advancement, and put lives at risk.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: October 27, 2022

Signed:

1. Kea B, Sun BC. Consensus development for healthcare professionals. Intern Emerg Med. 2015 Apr;10(3):373-83.