LAURA B. POWELL (SBN 240853)
2120 Contra Costa Blvd. #1046
Pleasant Hill, CA 94523
Telephone: (510) 457-1042
laura@laurabpowell.com

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TRACY HØEG, M.D., Ph.D.,** <br> **RAM DURISETI, M.D., Ph.D.,** <br> **AARON KHERIATY, M.D.,** <br> **PETE MAZOLEWSKI, M.D.,** <br> and <br> **AZADEH KHATIBI, M.D., M.S., M.P.H.,** <br><br> *Plaintiffs*, <br><br> v. <br><br> **GAVIN NEWSOM**, Governor of the State of California, in his official capacity; **KRISTINA LAWSON**, President of the Medical Board of California, in her official capacity; **RANDY HAWKINS, M.D.**, Vice President of the Medical Board of California, in his official capacity; **LAURIE ROSE LUBIANO**, Secretary of the Medical Board of California, in her official capacity; **MICHELLE ANNE BHOLAT, M.D., M.P.H., DAVID E. RYU, RYAN BROOKS, JAMES M. HEALZER, M.D., ASIF MAHMOOD, M.D., NICOLE A. JEONG, RICHARD E. THORP, M.D., VELING TSAI, M.D.**, and **ESERICK WATKINS**, members of the Medical Board of California, in their official capacities; and **ROB BONTA**, Attorney General of California, in his official capacity, <br><br> *Defendants*. | Case No. 2:22-at-01119 <br><br><br> **Notice of Motion and Memorandum In Support of Motion for Preliminary Injunction** <br><br><br><br> THIRTY MINUTES ORAL ARGUMENT REQUESTED |

**NOTICE OF MOTION AND MOTION TO THE HONORABLE COURT
AND TO ALL PARTIES:**

PLEASE TAKE NOTICE that on November 30, 2022, at 10:00 a.m., Plaintiffs hereby move for a preliminary injunction halting enforcement of California Assembly Bill (AB) 2098 on constitutional grounds.  As explained in detail in the accompanying memorandum, AB 2098 is facially unconstitutional under the First Amendment because it imposes a viewpoint-based restriction on Plaintiffs' speech, and additionally because it is void for vagueness, violating their Fourteenth Amendment rights to due process of law.  The Ninth Circuit recognizes that the abrogation of Plaintiffs' First Amendment rights for any time period constitutes irreparable harm, and likewise that a colorable First Amendment claim presumes that the balance of equities favors Plaintiffs.  Accordingly, this Court should enjoin Defendants from enforcing AB 2098 during the pendency of this litigation.

DATED:  November 2, 2022

/s/ *Laura B. Powell*
LAURA B. POWELL
Attorney for Plaintiffs

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................I

TABLE OF AUTHORITIES....................................................................................II

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 4

     I.     THE REGULATION OF PHYSICIANS IN CALIFORNIA................................... 4

     II.    THE PLAINTIFFS AND THEIR ETHICAL CONCERNS RELATED TO AB 2098................ 7

LEGAL STANDARD ............................................................................................ 12

ARGUMENT......................................................................................................... 13

     I.     PLAINTIFFS NOT ONLY HAVE A COLORABLE FIRST AMENDMENT CLAIM, BUT A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ...................................... 13

          A.     *AB 2098 Flagrantly Violates Plaintiffs' First Amendment Rights to Free Speech and Free Expression, and Their Patients' First Amendment Rights to Receive the Advice and Treatment Options that Plaintiffs Believe Are in Their Best Medical Interests* ................................................................. 13

          B.     *AB 2098 Contravenes Void for Vagueness Doctrine*............................... 21

     II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION, AND THE BALANCE OF EQUITIES WEIGHS HEAVILY IN PLAINTIFFS' FAVOR ........................................................................................................ 23

CONCLUSION...................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996).................................................................................................. 19

*Am. Beverage Ass'n v. City & County of San Francisco,*
   916 F.3d 749 (9th Cir. 2019) .................................................................................. 13

*Ashcroft v. Am. C.L. Union,*
   535 U.S. 564 (2002) ................................................................................................ 13

*Associated Press v. Otter,*
   682 F.3d 821 (9th Cir. 2012) .................................................................................. 13

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
   457 U.S. 853 (1982)................................................................................................. 19

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
   529 U.S. 217 (2000)................................................................................................. 15

*Brown v. Ent. Merchs. Ass'n,*
   564 U.S. 786 (2011)................................................................................................. 20

*Cal. Teachers Ass'n v. State Bd. of Educ.,*
   271 F.3d 1141 (9th Cir. 2001) ................................................................................ 22

*Child. of the Rosary v. City of Phoenix,*
   154 F.3d 972 (9th Cir. 2019) .................................................................................. 14

*Cohen v. California,*
   403 U.S. 15 (1971).................................................................................................. 23

*Conant v. Walters,*
   309 F.3d 629 (9th Cir. 2002) ................................................................. 15, 16, 20, 23

*Connally v. Gen. Constr. Co.,*
   269 U.S. 385 (1926)................................................................................................. 21

*Doe v. Harris,*
   772 F.3d 563 (9th Cir. 2014) .................................................................................. 13

*Elrod v. Burns,*
   427 U.S. 347 (1976)........................................................................................... 13, 23

*Gammoh v. City of La Habra,*
   395 F.3d 1114 (9th Cir. 2005) ................................................................................ 22

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972)................................................................................................. 21

*Hunt v. City of Los Angeles,*
   601 F. Supp. 2d 1158 (C.D. Cal. 2009) .................................................................. 22

*Index Newspapers v. U.S. Marshals Serv.,*
   977 F.3d 817 (9th Cir. 2020) .................................................................................. 19

*Martin v. EPA*,
  271 F. Supp. 2d 38 (D.D.C. 2002) .......................................................................... 19

*Matal v. Tam*,
  137 S. Ct. 1744 (2017) ........................................................................................... 14

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .......................................................................... 13, 23

*NAACP v. Button*,
  371 U.S. 415 (1963) ............................................................................................... 16

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) .................................................................... 14, 16, 17, 18

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................... 13

*Packingham v. North Carolina*,
  127 S. Ct. 1730 (2017) ........................................................................................... 19

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992) ............................................................................................... 20

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ........................................................................................ 14, 15

*Thomas v. Collins*,
  323 U.S. 516 (1945) ........................................................................................ 14, 23

*United States v. Alvarez*,
  567 U.S. 709 (2012) ........................................................................................ 14, 15

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ........................................................................................ 20, 21

*United States v. Wunsch*,
  84 F.3d 1110 (9th Cir. 1995) .......................................................................... 21, 23

*Viacom Int'l, Inc. v. FCC*,
  828 F. Supp. 741 (N.D. Cal. 1993) ....................................................................... 23

*Wardsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ................................................................................. 13

**STATUTES**

Assem. Bill 2098, 2021-2022 Reg. Sess., ch. 938, 2022 Cal. Stat (Section 1) .......... 21

Cal. Bus. & Prof. Code § 2001 ........................................................................................ 4

Cal. Bus. & Prof. Code § 2001.1 ..................................................................................... 4

Cal. Bus. & Prof. Code § 2004 ........................................................................................ 4

Cal. Bus. & Prof. Code § 2007 ........................................................................................ 4

Cal. Bus. & Prof. Code § 2220 ................................................................................. 6, 21

Cal. Bus. & Prof. Code § 2220.5 ..................................................................................... 4

Cal. Bus. & Prof. Code § 2234 ........................................................................ 4

Cal. Bus. & Prof. Code § 2234.1 ................................................................. 4, 5

Cal. Bus. & Prof. Code § 2236 *et seq.* ........................................................... 4

Cal. Bus. & Prof. Code § 2270 ........................................................................ 5

**OTHER AUTHORITIES**

Adam C. Schaffer *et al.*, *Rates and Characteristics of Paid Malpractice Claims Among US Physicians by Specialty, 1992-2014*, 177 J. Am. Med. Ass'n Intern. Med. 710 (2017), *available at* https://bit.ly/3Dy65xA ......... 6

Assem. Com. on Bus. & Pros., Analysis of Assem. Bill No. 2098 (Cal. 2021-2022 Reg. Sess.), as introduced Feb. 14, 2022 ...................................................................... 6

Jenin Younes, *The U.S. Government's Vast New Privatized Censorship Regime*, Tablet (Sept. 21, 2022), *available at* https://bit.ly/3W7eBuD (last visited Oct. 23, 2022).............................. 17

Nick Sawyer *et al.*, *State Medical Boards Should Punish Doctors Who Spread False Information About Covid and Other Vaccines*, Wash. Post (Sept. 21, 2022, 12:18 PM), *available at* https://wapo.st/3DeYLFK.................................................................... 12

S. Com. on Bus., Pros. & Econ. Dev., Analysis of Assem. Bill No. 2098 (Cal. 2021-2022 Reg. Sess.), as amended Jun. 21, 2022........................................................... 6

**RULES**

Fed. R. Civ. P. 65................................................................................ 1, 12

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. IV, § 8 ........................................................................... 1

U.S. Const. amend. I.......................................................................... 1, 2, 3, 13

U.S. Const. amend. XIV ......................................................................... 1, 2

**MEMORANDUM**

**INTRODUCTION**

Pursuant to Rules 65(a) and (b) of the Federal Rules of Civil Procedure, Plaintiffs Drs. Tracy Høeg, Ram Duriseti, Aaron Kheriaty, Pete Mazolewski and Azadeh Khatibi seek to preliminarily enjoin Defendants from enforcing a California statute known as Assembly Bill (AB) 2098, which purports to allow the Medical and Osteopathic Medical Boards of California to discipline physicians accused of disseminating "misinformation" about Covid-19.  Due to the infringement of Plaintiffs' First and Fourteenth Amendment rights, they request an expedited briefing schedule.

Assembly Bill (AB) 2098, signed into law on September 30, 2022, and effective January 1, 2023[1] empowers the Medical Board of California ("Board") and the Osteopathic Medical Board of California to discipline physicians who "disseminate" information about Covid-19 that departs from the "contemporary scientific consensus."  Plaintiffs are five physicians, licensed by the Board to treat patients in the state of California.  AB 2098 violates their First Amendment rights to free speech and expression, their patients' First Amendment rights to receive information from them, and their Fourteenth Amendment rights to due process of law.

First, the law imposes a quintessential viewpoint-based restriction, because it burdens speech that the Board determines diverges from the "contemporary scientific consensus." In safeguarding Americans' rights to free speech and expression, the First Amendment applies not only to majority opinions, but to minority views as well.  Indeed, it is minority views that need protection from government censorship—as this law shows.  Nor is there an exception to the prohibition on viewpoint-based discrimination simply because the law applies only to a regulated profession.  To the contrary, the Supreme Court and the Ninth Circuit recognize that professional

---

[1] In California, "non-urgent" statutes go into effect on the January 1 following the enactment date. Cal. Const. art. IV, § 8(c).

speech is entitled to heightened protection under the First Amendment, *especially* speech uttered in the context of a physician-patient relationship.

Viewpoint-based restrictions are presumptively unconstitutional, and therefore must be narrowly tailored to achieve a compelling government interest. By definition, "consensus" lags behind new discoveries, information, and cutting edge clinical and basic scientific research, precisely because such new information has not yet had a chance to be widely diffused and adopted. Rather than furthering any legitimate interest, therefore, the law harms relationships between doctors and patients.  It also deprives doctors of being able to fulfill their ethical obligations to act in their patients' best interests by sharing such advances with their patients, if those advances contradict the current "consensus" on Covid-19.  That AB 2098 undermines fundamentals of medical ethics and doctors' ability to treat their patients raises the specter of the law having been enacted for the sole purpose of censoring physicians who hold and express disfavored views. Indeed, that inference is corroborated by the fact that several of the bill's proponents have explicitly threatened on social media to use AB 2098 against Plaintiffs in order to silence them.  In short, AB 2098 infringes Plaintiffs' First Amendment rights because it impedes their ability to communicate with their patients in the course of treatment.  Likewise, it violates their patients'[2] First Amendment rights—to hear the honest advice of the doctors whom they have trusted to treat them, unfettered by concerns about Board-imposed discipline on their speech.

Second, AB 2098 is void for vagueness under the Fourteenth Amendment's Due Process Clause.  The term "contemporary scientific consensus" is undefined in the law and undefinable as a matter of logic.  No one can know, at any given time, the "consensus" of doctors and scientists on various matters related to prevention and treatment of Covid-19, particularly given that it is a

---

[2] Dr. Khatibi is both a medical provider and a patient who, as a result of her history of immune system complications, is in need of particularized and perhaps unorthodox medical advice with respect to Covid-19.  (*See* Declaration of Dr. Azadeh Khatibi, *attached as* Ex. E).  Thus, both her rights to speak and to receive information are being infringed.

new disease where understanding of it is still rapidly evolving.  And even if such a poll could theoretically be taken, who would qualify to be polled?  All doctors and scientists, or only those in certain, pertinent fields?  Who determines which fields?  How often would such polls be taken to ensure the results are based on the most up-to-date science?  How large a majority of the polled professionals is needed to qualify as a "consensus"?  The very existence of these questions illustrates that any attempt at a legal definition of "scientific consensus" according to which doctors may operate in their day-to-day practice is impractical and borders on the absurd.  As Plaintiffs attest, they cannot possibly know what the "scientific consensus" is at any given moment, making them fearful of being honest with patients and making individualized recommendations. Put succinctly and in legal terms, AB 2098 is unconstitutionally vague and thereby creates a severe chilling effect, in violation of Plaintiffs' rights to due process of law.

Rarely does a state legislature pass a bill that is so obviously unconstitutional.  Even more rarely does a governor sign that bill into law.  Accordingly, Plaintiffs have put forth a "colorable" First Amendment claim, the standard for grant of a preliminary injunction in the Ninth Circuit, as irreparable harm and balance of equities are presumed to result from First Amendment violations. In the absence of a preliminary injunction, Plaintiffs will suffer irreparable harm because beginning January 1, 2023, they will be subject to discipline under AB 2098.  Furthermore, Plaintiffs cannot be certain whether their speech prior to the statute's effective date may be used against them either as the basis for a complaint, or to enhance any sanctions for speech occurring after January 1, 2023. Thus, AB 2098 has already chilled Plaintiffs' speech, and deprived patients of their First Amendment rights to receive their doctors' honest advice.  Consequently, a preliminary injunction is warranted even prior to the effective date of the statute.

For these reasons, as well as those set forth below, Plaintiffs ask the Court to declare AB 2098 unconstitutional, to prevent it from going into effect, and to immediately halt its enforcement.

**STATEMENT OF FACTS**[3]

**I.     THE REGULATION OF PHYSICIANS IN CALIFORNIA**

The Board is tasked with issuing medical licenses and certificates in the State of California, hearing disciplinary actions against licensees, and suspending, revoking, or otherwise limiting certificates, among other responsibilities.  Cal. Bus. & Prof. Code §§ 2004 & 2220.5.  California Business and Professions Code section 2001.1 requires the Board to assign the "highest priority" to the protection of the public and mandates that "[w]henever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount."  The Board's members are appointed by the Governor and state lawmakers. Cal. Bus. & Prof. Code § 2001(b).  Seven of the Board's 15 members are designated as "public members" who may not be (or ever have been) licensed physicians. Cal. Bus. & Prof. Code §§ 2001(a) & 2007.

Section 2234 requires the Board to discipline doctors who engage in "unprofessional conduct."  The statute enumerates seven grounds, which include a single act of gross negligence, repeated acts of negligence, and incompetence. Other sections provide additional, specific standards for unprofessional conduct.  Cal. Bus. & Prof. Code § 2236 *et seq*.

However, California Business and Professions Code section 2234.1 provides that a doctor may not be subject to discipline pursuant to section 2234 "solely on the basis that the treatment or advice he or she rendered to a patient is alternative or complementary medicine," subject to several conditions.  "Alternative or complementary medicine" is defined as "those health care methods of diagnosis, treatment, or healing that are not generally used but that provide a reasonable potential for therapeutic gain in a patient's medical condition that is not outweighed by the risk of the health

---

[3] A more detailed statement of facts is laid out in the Complaint, ¶¶ 12-86.  A succinct version of those facts most pertinent to the request for a preliminary injunction is offered here.

care method."

Subdivision (c) of California Business and Professions Code section 2234.1 states: "Since the National Institute of Medicine has reported that it can take up to 17 years for a new best practice to reach the average physician and surgeon, it is prudent to give attention to new developments not only in general medical care but in the actual treatment of specific diseases, particularly those that are not yet broadly recognized in California."

On September 30, 2022, Governor Gavin Newsom signed AB 2098 into law, after it was passed by the state legislature.  (Complaint ¶ 18).  AB 2098 amended section 2270's definition of "unprofessional conduct" to include "dissemination of misinformation or disinformation related to the SARS-CoV-2 coronavirus, or 'COVID-19.'"  (Complaint ¶ 19).

Section 1 of AB 2098 lays out the ostensible justification for the bill: the death toll of Covid-19; that Center for Disease Control and Prevention ("CDC") data shows that unvaccinated individuals are at significantly higher risk of dying; that the spread of misinformation and disinformation about Covid-19 vaccines has weakened public confidence[4] and placed lives at serious risk; and that "major news outlets" have reported that health care professionals are "some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines." (Complaint ¶ 20).  Section 2 deems it "unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." (Complaint ¶¶ 19, 21).

"Misinformation" is defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."  (Complaint ¶ 22).  The Act neither defines nor provides guidance for determining the meaning of "contemporary scientific consensus."

---

[4] The section pointedly omits mention in what specifically public confidence was weakened.

(Complaint ¶ 23). "Disinformation" is defined as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead."  (Complaint ¶ 24).  "Disseminate" is defined as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."  (Complaint ¶ 25).

Physicians who are negligent and commit malpractice (for example, a doctor who advises a patient to inject himself with bleach to treat Covid-19) are already subject to tort lawsuits and disciplinary actions by the Board under existing state law.  For example, the Board is empowered to investigate, and if necessary, take enforcement action against "any physician and surgeon where there have been any judgments, settlements, or arbitration awards requiring the physician and surgeon or his or her professional liability insurer to pay an amount in damages in excess of a cumulative total of thirty thousand dollars."[5]  Cal. Bus. & Prof. Code § 2220(b).

AB 2098's sponsor, the California Medical Association, argued that this law is needed because of physicians who "call[] into question public health efforts such as masking and vaccinations."  Assem. Com. on Bus. & Pros., Analysis of Assem. Bill No. 2098, at 10 (Cal. 2021-2022 Reg. Sess.), as introduced Feb. 14, 2022.   Likewise, the bill analysis from the Senate Committee refers to the problem of "misinformation about the safety and effectiveness of the COVID-19 vaccine and the use of masks for prevention."  S. Com. on Bus., Pros. & Econ. Dev., Analysis of Assem. Bill No. 2098, at 4 (Cal. 2021-2022 Reg. Sess.), as amended Jun. 21, 2022.

Governor Newsom signed AB 2098 into law with the following caveat:

> I am signing this bill because it is narrowly tailored to apply only to those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care while interacting directly with a patient under their care.  To be clear, this

---

[5] It should be noted that $30,000 is an almost laughably small amount in the medical malpractice context.  Recent studies have estimated than an average medical malpractice settlement is well in excess of $300,000.  *See, e.g.*, Adam C. Schaffer *et al.*, *Rates and Characteristics of Paid Malpractice Claims Among US Physicians by Specialty, 1992-2014*, 177 J. Am. Med. Ass'n Intern. Med. 710 (2017), *available at* https://bit.ly/3Dy65xA.  This means that the Board's attention is already called to even the smallest cases of alleged malpractice.

> bill does not apply to any speech outside of discussions directly related to COVID-19 treatment within a direct physician patient relationship.  I am concerned about the chilling effect other potential laws may have on physicians and surgeons who need to be able to effectively talk to their patients about the risks and benefits of treatments for a disease that appeared in just the last few years.  However, I am confident that discussing emerging ideas or treatments, including the subsequent risks and benefits does not constitute misinformation or disinformation under this bill's criteria.

(Complaint ¶ 27).  Despite Governor Newsom's attempts to limit the bill's reach, his commentary in the form of a signing statement has no legal effect under California law, and so the law will be enforced as it is written, not as the Governor believes it should be interpreted.  (Complaint ¶ 28).

## II.      THE PLAINTIFFS AND THEIR ETHICAL CONCERNS RELATED TO AB 2098

Plaintiffs are physicians residing, operating practices, and licensed to practice in the State of California.  (Complaint ¶¶ 32-51).

Plaintiff Dr. Høeg is a Physical Medicine and Rehabilitation Physician who also holds a Ph.D. in Epidemiology and Public Health. (10/31/22 Declaration of Dr. Tracy Høeg, *attached as* Exhibit A ¶¶ 2-3).  She has published, as senior or first author, nine epidemiological analyses of topics pertaining to the Covid-19 pandemic. (*Id.* ¶ 8).

Plaintiff Dr. Ram Duriseti as a practicing Emergency Room physician at Stanford Department of Emergency Medicine and Mills-Peninsula Hospital.  (10/20/22 Declaration of Dr. Ram Duriseti, *attached as* Exhibit B ¶¶ 2-3).  Dr. Duriseti also earned a Ph.D. in engineering from Stanford University.  (*Id.* ¶ 2).  His dissertation and subsequent research and publications focused on computational modeling of complex decisions and, in particular, optimizing complex medical decisions.  (*Id.*).  He has treated hundreds of Covid-19 patients, read and analyzed hundreds of journal articles on Covid-19 and related topics, co-authored academic analyses of Covid-19 mitigation policies and their impacts, and written multiple evidence-based expert declarations on

Covid-19 related topics submitted to courts.  (*Id.* ¶ 5).

Plaintiff Dr. Aaron Kheriaty is a professor of Psychiatry and Medical Ethics, and publishes papers, books, and articles for lay audiences as well.  (10/18/22 Declaration of Dr. Aaron Kheriaty, *attached as* Exhibit C ¶¶ 2-3).  In the early months of the Covid-19 pandemic, Dr. Kheriaty co-authored the pandemic ventilator triage guidelines for the University of California, Irvine (UCI), where he was a Professor of Psychiatry and Director of the Medical Ethics Program at the time, and consulted for the California Department of Health on the state's triage plan for allocating scarce medical resources.  (*Id.* ¶ 4).  When demand for Covid-19 vaccines outpaced the supply, Dr. Kheriaty helped develop UCI's vaccine-allocation policy.  (*Id.* ¶ 4).

Plaintiff Dr. Pete Mazolewski is a trauma and general surgeon for John Muir Health and has handled the highest volume of acute and general trauma surgeries in his health care system without having a single lawsuit filed against him.  (Declaration of Dr. Pete Mazolewski, *attached as* Exhibit D ¶ 5).

Plaintiff Dr. Azadeh Khatibi is an ophthalmologist with a master's in public health who has cared for numerous patients with infectious diseases.  (Exhibit E ¶¶ 2-5).  Dr. Khatibi is also a patient:  she suffered from a serious, life-threatening illness, and was given a 25% chance of surviving five years.  (*Id.* ¶ 6).  After consulting with numerous doctors, Dr. Khatibi decided to adopt the approach of one whose views bucked consensus that she should opt for a less aggressive treatment.  (*Id.*  ¶¶ 13-15).  Not only did she survive, but her "results were remarkable, to the surprise and delight of all [her] doctors.  Doctors were eager to find out [her] protocol when they realized [she] was doing so well."  (*Id.* ¶ 16).  She has lingering immune system issues as a result of her illness.  (*Id.* ¶ 6).

Plaintiffs all attest to the severe chilling effect that enactment of AB 2098 has had and will continue to have on them.  The doctor-patient relationship is predicated upon trust, which is built

when patients know that they can obtain honest, up-to-date advice from their physicians that is tailored to their individual circumstances and needs, as opposed to merely parroting an apparent "consensus." (*See, e.g.,* Exhibit C ¶ 6).  In Dr. Høeg's words, "one of the reasons my patients place deep faith in me is that I am fully honest and transparent about their diagnoses, prognoses and potential treatments, and because prior to arriving at my recommendations, I take the time to thoroughly review the relevant scientific literature." (Exhibit A ¶ 10).

As a result of their training and experience as scientists and physicians, Plaintiffs strongly believe that the concept of "scientific consensus" is problematic and represents a misunderstanding of the scientific process.  (Complaint ¶¶ 53-73).  Plaintiffs know from experience that one day's "consensus" may be tomorrow's malpractice.  For example, at the beginning of the pandemic, the standard of care for treatment of patients with severe Covid-19 was intubation.  (Exhibit B ¶ 8). Dr. Duriseti resisted invasive intubation when the consensus called for this intervention—then the consensus changed and his view became the prevailing one.  (*Id.* ¶ 8).  Using the same example, Dr. Kheriaty observes that "[y]esterday's minority opinion often becomes today's standard of care." (Exhibit C ¶ 10).

In the 1990s, Dr. Mazolewski was taught that every case of appendicitis should be operated on as quickly as possible.  (Exhibit D ¶ 9).  But around 2000, it became clear to him, based on his professional clinical experience, that immediate appendectomy should not be the standard treatment for all patients diagnosed with appendicitis, as those with complicated situations have high negative sequela rates following surgery.  (*Id.* ¶ 9).  Dr. Mazolewski found that practicing medicine in accordance with his discovery was not easy, as he faced enormous professional peer pressure to follow the "consensus."  (*Id.* ¶ 10).  But he did not waver, because he believed that his approach was in his patients' best interests.  (*Id.* ¶ 10).  Today, Dr. Mazolewski's approach is standard practice.  (*Id.* ¶ 11).  Put in his own words:

science is always evolving and starts with the clinician who recognizes an improvement over the standard of care and implements that into his or her practice.  This new approach then undergoes scrutiny with rigorous clinical trials which can take years to complete, and by virtue, the "contemporary scientific consensus" lags behind what is being observed by the physician treating patients every day.

(*Id.* ¶ 12).

In the meantime, doctors are not only entitled but obligated to treat and advise their patients according to their best judgment, whether or not that aligns with any ostensible consensus. (Complaint ¶¶ 66-73; *see* Exhibit A ¶ 22).

Not only do rules of ethics require doctors to exercise their own judgment in treating patients rather than following "consensus," especially if they are ahead of the curve when it comes to experience and research, but the very concept of a "consensus" is highly problematic, especially as applied to a disease as new as Covid-19.  Professionals who dissented from health officials on various matters related to Covid-19 (and in other medical contexts as well) have been silenced socially as well as by mainstream and social media, while those who tend to promote government-approved policies are amplified by the same sources.  (Complaint ¶ 71; Exhibit B ¶ 9).

As happens often in science, it is the dissenters who turned out to be correct.  For example, the "scientific consensus" for some time was that the Covid-19 vaccines prevented transmission to third parties; two years later, it is clear they do not, or only minimally, prevent transmission.  (*See* Exhibit B ¶¶ 14-15).  Likewise, emerging data has indicated that the risk of vaccination-induced myocarditis in certain age categories may outweigh the benefits of vaccination.  (Exhibit A ¶¶ 23-24).  For that reason, several European countries, including Sweden, Denmark, Norway, and Finland, are recommending the newest bivalent booster only for those over 50 or 65 (depending on the specific country) or otherwise high-risk.  (*Id.* ¶ 23).  Denmark has explicitly prohibited children under 18 from getting vaccinated absent a medical evaluation from a physician who concludes it is

advisable in the specific case.  (*Id.*).  All of these recommendations are made by competent medical professionals in peer countries, yet run contrary to what California has implicitly declared to be the medical "consensus."  As Dr. Høeg explains, "[t]his puts physicians who are simply trying to give appropriate and individualized recommendations in a difficult position, particularly considering they may not know what the California Medical Board's 'consensus' is at the moment."  (*Id.* ¶ 24).

Dr. Khatibi believes that the courage of a "dissenter" may have saved her life:

> If the lone doctor had been afraid of getting investigated or having his license revoked for suggesting a "non-consensus opinion," I wouldn't have heard about options for aggressive treatment. Had my doctor's speech been chilled to only advise and offer "consensus" treatments, I might not be alive today. Moreover, the medical advancements that come from noticing my excellent results and then applying it to others would have never happened.

(Exhibit E ¶ 17).

That AB 2098 will be used as a weapon to punish doctors who dissent from the apparent mainstream is not mere speculation.  (Complaint ¶¶ 74-81).  Plaintiffs Høeg, Duriseti, Kheriaty, Khatibi and other doctors, have directly experienced threats, including from other doctors, in response to expressing their opinions on topics related to Covid-19, sometimes with direct references to AB 2098 (Exhibits F-L).  Many of these threats have emanated with particular ferocity from physicians associated with a nonprofit organization called "No License for Disinformation" (NLFD).  NLFD was among AB 2098's primary proponents.  (Complaint ¶ 76).  The bill's author twice invited its executive director to testify in legislative hearings as one of two lead witnesses in support of the bill.  (Complaint ¶ 76).  Its members frequently encourage other Twitter users to report licensed physicians to their medical boards for making any statements about Covid-19 that NFLD considers inaccurate.  (Complaint ¶ 76).

For example, on January 1, 2022, Dr. Chris Hickie, an Arizona physician associated with

NLFD,[6] tweeted a screenshot depicting a portion of a study by Plaintiff Dr. Høeg that contained the phrase:  "the risk of myocarditis following vaccination is consistently higher in young males," and remarked, "You deserve to lose your medical license, Hoeg," and commented months later:  "I look forward to reporting you to your medical board once a certain law is passed in California." (Exhibit F).

On August 10, 2022, Dr. Hickie tagged Dr. Høeg along with another doctor in a tweet that read, "Since you are also in California, Mantz, I can report you now alongside quack Høeg for spreading medical disinformation once that law passes in California."  (Exhibit G).

In response to a tweet from Dr. Høeg sharing an op-ed she published advocating against AB 2098, Dr. Nichols tweeted on June 29, 2022, "Why so defensive, Tracy?  Scared?"  (Exhibit H).  Dr. Hickie responded the same day to a September 29, 2022, tweet from Dr. Kheriaty asserting that the mass Covid-19 vaccination campaign was reckless with "Can't wait to see you lose your license."  (Exhibit I).  Dr. Khatibi received a threat from an individual named Adrian Egli, who stated, "I will take great pleasure in seeing #AB2098 become law and seeing your license to practice medicine in California gone!"  (Exhibit J).  On October 19, 2022, Dr. Hickie tweeted at Dr. Høeg, "If you are still licensed in California on Jan 1, 2023, when AB 2098 becomes law, you are being reported to the Medical Board of California for spreading medical disinformation as a physician." (Exhibit K).  Just yesterday (November 1, 2022), Dr. Hickie tweeted, "Please ask @ABPMR and @ABMSCert to sanction Hoeg for disinformation in pediatrics, including COVID-19."  (Exhibit L).

## **LEGAL STANDARD**

Rule 65(a) of the Federal Rules of Civil Procedure allows a court to issue a preliminary

---

[6] Dr. Hickie was one of five physicians representing NFLD in an op-ed published in the *Washington Post* on September 21, 2021, entitled "State medical boards should punish doctors who spread false information about Covid and vaccines."  Nick Sawyer *et al.*, *State Medical Boards Should Punish Doctors Who Spread False Information About Covid and Other Vaccines*, Wash. Post (Sept. 21, 2022, 12:18 PM), *available at* https://wapo.st/3DeYLFK.

injection after notice has been provided to an adverse party.   A preliminary injunction is appropriate if the Plaintiff demonstrates: (1) a substantial likelihood of success on the merits; (2) the necessity of the injunction to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction is in the public's interest.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019).

Under the Supreme Court's precedents, the "loss of First Amendment freedoms, even for minimal periods of time, [is an] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012).  And once a "colorable First Amendment claim" has been put forth, the second through fourth prongs of the *Nken* inquiry are presumed to have been met.  *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (observing that the balance of equities and public interest favors those whose First Amendment rights are being chilled.); *Wardsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) ("Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim.").

## **ARGUMENT**

### I.   **PLAINTIFFS NOT ONLY HAVE A COLORABLE FIRST AMENDMENT CLAIM, BUT A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

*A.  AB 2098 Flagrantly Violates Plaintiffs' First Amendment Rights to Free Speech and Free Expression, and Their Patients' First Amendment Rights to Receive the Advice and Treatment Options that Plaintiffs Believe Are in Their Best Medical Interests*

The First Amendment to the United States Constitution, incorporated against the States through the Fourteenth Amendment, prohibits Congress from making laws "abridging the freedom of speech."  U.S. Const. amend. I; *see also Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002)

("[G]overnment has no power to restrict expression because of its message, its ideas, its subject matter, or its content."); *Thomas v. Collins*, 323 U.S. 516, 531 (1945) ("The First Amendment gives freedom of mind the same security as freedom of conscience … . And the rights of free speech and free press are not confined to any field of human interest.").

Laws that discriminate based on viewpoint—that is, due to the ideas or opinions the speech in question conveys—are presumptively unconstitutional. *See Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("[T]he essence of viewpoint discrimination" is legal prohibitions that "reflect[] the Government's disapproval of a subset of messages it finds offensive."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995) (holding that viewpoint discrimination is an "egregious form of content discrimination" and therefore "presumptively unconstitutional"); *Child. of the Rosary v. City of Phoenix*, 154 F.3d 972, 980 (9th Cir. 2019) (explaining that viewpoint discrimination exists when "the government targets … particular views taken by speakers on a subject.") (quoting *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985)).   This stringent standard reflects the fundamental principle that governments have "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (internal citations and quotation marks omitted).

Labeling speech "misinformation" does not strip it of First Amendment protection.  That is so even if the speech is, indeed, false. *United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality op.) ("Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements.  This comports with the understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee.").  In refusing to recognize a First Amendment exception for "false" speech, the Framers

of our Constitution recognized that concept is impossible to define, and the great danger in making the Government arbiter of the truth.  Simply holding a minority view—or even departing from a "consensus"—does not necessarily mean one is wrong: yesterday's "misinformation" often becomes today's viable theory and tomorrow's established fact.  *See id.* at 752 (Alito, J., dissenting) ("Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal.  Today's accepted wisdom sometimes turns out to be mistaken."); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views.").

The law in question here—AB 2098—violates the First Amendment because by threatening to punish doctors who hold and express to their patients disfavored perspectives on the prevention of and treatment for Covid-19, it discriminates based on viewpoint.  *See Rosenberger*, 515 U.S. at 835 ("Vital First Amendment speech principles are at stake here.  The first danger to liberty lies in granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and if so, for the State to classify them.").  The Ninth Circuit has "recognized the core First Amendment values of the doctor-patient relationship," *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002), and guided by First Amendment principles prohibiting viewpoint discrimination has enjoined policies that "threatened to punish physicians for communicating with their patients about the medical use of marijuana," *id.* at 633.  Upholding the district court's grant of an injunction in that case, the Ninth Circuit held that "[p]hysicians must be able to speak frankly and openly to patients.  That need has been recognized by the courts through the application of the common law doctor-patient privilege." *Id.* at 636 (citing Fed. R. Evid. 501).

The *Conant* court, like the Supreme Court, also rejected the Government's claim that belonging to a regulated profession requires any diminution of First Amendment rights.  "To the

contrary," the court declared, "professional speech may be entitled to 'the strongest protection our Constitution has to offer.'"  *Id.* at 637 (quoting *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 634 (1995)); *see also Nat'l Inst.*, 138 S. Ct. at 2365 (invalidating California law requiring pregnancy-related clinics to provide a government-drafted script about the availability of state-sponsored services, including abortion, and refusing to deem "'professional speech' … a separate category …. Speech is not unprotected merely because it is uttered by 'professionals.'"); *NAACP v. Button*, 371 U.S. 415, 439 (1963) ("[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights.").

There is a reason that courts—such as the *Conant* court—are highly protective of speech uttered in the context of the doctor-patient relationship:  physicians simply cannot do their jobs if being candid with their patients about prevention and treatment methods could entail professional discipline.  Plaintiffs all attest that they are unable to properly treat and advise patients while being subject to AB 2098, because they know that they can be reported, investigated, and disciplined (potentially losing their medical licenses), for conveying information about Covid-19 that does not align with the "scientific consensus."  *See Nat'l Inst.*, 138 S. Ct. at 2374 ("Take medicine, for example.  'Doctors help patients make deeply personal decisions, and their candor is crucial.'") (quoting *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1328 (11th Cir. 2017)).

As discussed *supra*, the very concept of a "scientific consensus" is a misnomer, especially since the term is not defined (let alone with any precision) in the Act's text.  For example, how are Plaintiffs to know the percentage of doctors and scientists who must hold a view in order for it to qualify as a "scientific consensus"?  Are they to account for all doctors and scientists in the entire world, or only those in certain fields or certain geographical regions?  Should anyone holding a degree in a field of medicine or adjacent scientific discipline, including anatomy, for example, get a vote?

Moreover, an apparent "consensus" does not translate into an actual "consensus." Scientists and doctors who opposed government Covid restrictions since the beginning of the pandemic have been silenced by the media and the government, giving the false impression of agreement on the wisdom and efficacy of many mitigation measures. *See Nat'l Inst.*, 138 S. Ct. at 2375 ("Professionals might have a host of good-faith disagreements, both with each other and with the government."); s*ee also* Jenin Younes, *The U.S. Government's Vast New Privatized Censorship Regime*, Tablet (Sept. 21, 2022), *available at* https://bit.ly/3W7eBuD (last visited Oct. 23, 2022).[7]

Even if the "scientific consensus" could be and was defined, physicians should not be hamstrung by the beliefs of a certain percentage of their peers. "Scientific consensus" is often behind the curve; indeed, progress in science and medicine occurs as a result of some doctors and scientists finding, in the course of research, critical thinking, or treating patients, that the current consensus is actually *not* the best approach. For example, Dr. Duriseti defied the then-prevailing wisdom at the beginning of the pandemic by refusing to intubate individuals suffering severe Covid-19 symptoms. (Exhibit B ¶ 8). Now, the dominant view is that intubation is not appropriate and subjects the patient to greater danger. (*Id.* ¶ 8).

Outside of the Covid-19 context, Dr. Mazolewski determined after years of practice that surgery for appendicitis (then the standard treatment) was inappropriate for those presenting with complex cases, as it resulted in needlessly high complication rates. (Exhibit D ¶¶ 9-10). Dr. Mazolewski resisted peer pressure to follow the consensus, knowing that acting in accordance with the knowledge he had developed though professional practice was in his patients' best interests. Now, Dr. Mazolewski's approach is standard practice. (*Id.*). Had Drs. Duriseti and Mazolewski feared legal repercussions for utilizing their own expertise to diagnose, advise, and treat patients,

---

[7] By way of example, just because Soviet TV only showed people who agreed with the way the Communist Party ran the country, that did not mean there was a "consensus" among citizens of the Soviet Union that Communism works. All it meant was that the dissenting voices were silenced.

their own methods that ultimately proved superior might never have come to light, resulting in poorer outcomes for and unnecessary harm to patients.  *See Nat'l. Institute*, 138 S. Ct. at 2374 ("[W]hen the government polices the content of professional speech, it can fail to 'preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.'") (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)).

The Supreme Court recognizes that regulating professional speech "pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Nat'l Institute*, 138 S. Ct. at 2371 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)).  In fact, the Court understood the specific danger of imposing burdens on physicians' speech: "Throughout history, governments have 'manipulat[ed] the content of doctor patient discourse' to increase state power and suppress minorities[.]"  *Id.* at 2374 (quoting Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 201-02 (1994)).

That "suppress[ing] unpopular ideas or information" is the true goal of AB 2098 may be inferred from the fact that some of its most vocal proponents and some of those responsible for crafting the law have explicitly threatened to use it to punish Plaintiffs for expressing unpopular views on social media, and even for conducting and sharing scientific studies that go against the grain.  These doctors have tweeted such things as "I look forward to reporting you to your medical board once a certain law is passed in California" and "Can't wait to see you lose your license." (*See* Exhibits F-L).  *See Nat'l Inst.*, 138 S. Ct. at 1375 ("States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose 'invidious discrimination of disfavored subjects.'" (quoting *Cincinnati v. Discovery Network*, 507 U.S. 410, 423-24 (1993))).  In sum, AB 2098 already has had, and will, unless enjoined, continue to have a profound chilling effect on Plaintiffs—a First Amendment violation in and of itself.  *See Index*

*Newspapers v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) ("As the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013)).

AB 2098 also deprives patients like Dr. Khatibi of their right to receive information—a First Amendment corollary to the right to speak and express oneself. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S. Ct. 1730, 1735 (2017); *see also Martin v. EPA*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002) ("[W]here a speaker exists …., the protection afforded is to the communication, to its source and to its recipients both." (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976))); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (holding the right to receive information is "an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them."); *id.* ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." (quoting *Lamont v. PMG*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring))).

Had a law prevented doctors from offering treatment options that bucked "consensus," Dr. Khatibi might very well never have learned of the treatment course she ended up adopting, and as a result might not have been alive today. (Exhibit E ¶ 17). In contrast to Dr. Khatibi, Plaintiffs' current patients are in danger of being deprived of their right to receive their physicians' treatment advice unfettered by physicians' concerns about professional discipline. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("The First Amendment directs us to be especially

skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").

Because AB 2098 discriminates based on viewpoint, it is subject to strict scrutiny.  Under that exacting standard, it can survive judicial review *only* if the government proves that it is narrowly tailored to serve a compelling state interest.  *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011).  Such an exacting standard is almost never met.  *Id.* ("[Strict scrutiny] is a demanding standard.  'It is rare that a regulation restricting speech because of its content will ever be permissible.'" (quoting *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000))).  The State must identify a specific, "actual problem" in need of solving, *Playboy*, 529 U.S. at 818, and demonstrate that the curtailment of speech is necessary to resolve that problem, *see R.A.V. v. St. Paul*, 505 U.S. 377, 382-83 (1992).

AB 2098 is neither narrowly tailored, nor enacted to address a compelling government interest.  Instead, the law *jeopardizes* the societally and constitutionally recognized, sacred doctor-patient relationship.  *See Conant*, 309 F.3 at 636 (explaining that courts recognize "[t]he doctor-patient privilege" because it "reflects 'the imperative need for confidence and trust" inherent in the doctor-patient relationship.'" (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980))).

As Plaintiffs attest, patients trust them because they are forthcoming and often ahead of the curve.  With the threat of discipline hanging over their heads, they are more likely to self-censor on any Covid-related topic, even if they believe that the information they are withholding would be in their patients' best interests.  The bill not only fails to further any legitimate government aim, but *undermines* the judicially recognized First Amendment interest in protecting the relationship between doctors and patients.  *Id.* at 636 ("The government policy … strike[s] at core First amendment interests of doctors and patients.  An integral component of the practice of medicine is the communication between a doctor and a patient.").

The justification contained in the bill for its passage is that "major news outlets" have reported that health care professionals are "some of the most dangerous propagators of inaccurate information regarding the Covid-19 vaccines."  *See* Assem. Bill 2098, 2021-2022 Reg. Sess., ch. 938, 2022 Cal. Stat (Section 1).  "Major news outlets" making assertions—not substantiated in the text of AB 2098—is hardly proof that Californians are dying because doctors are spreading "misinformation" about the Covid-19 vaccines, warranting viewpoint discriminatory laws.  Indeed, the flimsiness of this rationale casts doubt on the genuineness of the Government's purported interest.

Even assuming, *arguendo*, that protecting the public from incompetent treatment of Covid-19 is a compelling state interest, California cannot show that AB 2098 is narrowly tailored to effectuate that aim.  The State already has tools to discipline incompetent doctors, *see* Cal. Bus. & Prof. Code § 2220(b), and there is no evidence whatsoever that these existing methods are insufficient to meet the State's interest.  Because it is well-settled that "if a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 804.  In sum, AB 2098 cannot meet the strict-scrutiny test.

### B.  AB 2098 Contravenes Void for Vagueness Doctrine

Due process of law requires that legal prohibitions be clearly defined.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Vague laws may trap the innocent by failing to provide fair warning and lead to arbitrary and discriminatory enforcement, delegating basic policy decisions to police, judges, and juries.  *Id.* at 109.  A law is vague if it "does not give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Id.* at 108-09; *see Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("[D]ue process clause requires a statute to be sufficiently clear so as not to cause persons of common intelligence … [to] guess at its meaning and differ as to its application[.]"); *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1995)

("A statute is void for vagueness when it does not sufficiently identify the conduct that is prohibited.").

Vague laws are of particular concern in the First Amendment context because they "operate[] to inhibit the exercise of" First Amendment rights. *Grayned*, 408 U.S. at 109 (quoting *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961)); *see also Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005) ("A greater degree of specificity and clarity is required when First Amendment rights are at stake."). Where a statute "clearly implicates free speech rights," a facial vagueness challenge is appropriate. *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). It is sufficient that the challenged statute regulates and potentially chills speech which, in the absence of any regulation, receives some First Amendment protection. *Id.* In the vagueness inquiry, the requirement that laws be precise is aimed at preventing "chill"; *i.e.*, a situation where citizens will steer far wider than necessary to avoid engaging in prohibited speech rather than risk sanctions. *Hunt v. City of Los Angeles*, 601 F. Supp. 2d 1158 (C.D. Cal. 2009).

For reasons discussed extensively above, Plaintiffs cannot know what conduct or speech is prohibited, because the term "scientific consensus" is undefined and, because it is ever-shifting, arguably undefinable. Is it the position of health authorities, and if so, state, local, or federal? Is it the position of a certain percentage of practicing doctors? What percentage? An absolute majority? A mere plurality? If a consensus is to be determined this way, how are Plaintiffs to know what the consensus stance is, given that there are not daily polls of all American (or California) physicians on every subject pertaining to Covid-19? Even if such a poll could theoretically be taken, can all doctors and scientists participate, or only those in certain fields? Or only those treating Covid-19 patients? Because the term "scientific consensus" is not clearly defined, and arguably impossible to determine, the law is open to arbitrary implementation by the Board, which includes many non-

physicians.  *See Cohen v. California*, 403 U.S. 15, 25 (1971) ("'[D]isturb[ing] the peace … by … offensive conduct' failed to give sufficient notice as to what was prohibited"); *Thomas*, 323 U.S. at 535 (striking down state statute that failed to distinguish between union membership, solicitation, and mere discussion or advocacy, leaving "no security for free discussion."); *Conant*, 309 F.3d at 639 ("[T]he government has been unable to articulate exactly what speech is prescribed … . Thus, whether a doctor-patient discussion of medical marijuana constitutes a 'recommendation' depends largely on the meaning the patient attributes to the doctor's words.  This is not permissible under the First Amendment."); *Wunsch*, 84 F.3d at 1119 ("Clearly, 'offensive personality' is an unconstitutionally vague term in the context of this statute").

## II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION, AND THE BALANCE OF EQUITIES WEIGHS HEAVILY IN PLAINTIFFS' FAVOR

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373.  In fact, the Ninth Circuit presumes that the other three prongs of the inquiry are met once a "colorable First Amendment claim" has been put forth, for the existence of such a claim presumptively establishes irreparable harm and tips the balance of equities in Plaintiffs' favor.  *See Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Viacom Int'l, Inc. v. FCC*, 828 F. Supp. 741, 744 (N.D. Cal. 1993) ("Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim.").

For the reasons discussed *supra*, Plaintiffs have established not only a colorable First Amendment claim, but a substantial likelihood of success on the merits of that claim.  Thus, they

have shown that they are entitled to a preliminary injunction.

## **<u>CONCLUSION</u>**

For the reasons set out above, the Court should immediately enjoin the Government from enforcing AB 2098. A form of order is attached as an exhibit to the preliminary injunction motion.

Respectfully submitted,

/s/ *Laura B. Powell*
LAURA B. POWELL (SBN 240853)
2120 Contra Costa Blvd #1046
Pleasant Hill, CA 94523
Telephone: (510) 457-1042
laura@laurabpowell.com

*Attorney for Plaintiffs*