1  LAURA B. POWELL (CA Bar 240853)
   2120 Contra Costa Blvd. #1046
2  Pleasant Hill, CA 94523
   Telephone: (510) 457-1042
3  laura@laurabpowell.com
   *Local Counsel*
4
   *Attorney for Plaintiffs*
5

6              **IN THE UNITED STATES DISTRICT COURT**
               **FOR THE EASTERN DISTRICT OF CALIFORNIA**
7

8  **TRACY HØEG, M.D., Ph.D.,**                )
9  **RAM DURISETI, M.D., Ph.D.,**              )
   **AARON KHERIATY, M.D.,**                   )   **Case No. 2:22-cv-01980-WBS-AC**
10 **PETE MAZOLEWSKI, M.D.,**                  )
   and                                         )
11 **AZADEH KHATIBI, M.D., M.S., M.P.H.,**     )
                                               )
12           *Plaintiffs*,                     )   **Exhibits Accompanying Memorandum**
                                               )   **In Support of Motion for Preliminary**
13        v.                                   )   **Injunction**
                                               )
14 **GAVIN NEWSOM**, Governor of the State     )
   of California, in his official capacity;    )
15 **KRISTINA LAWSON**, President of the       )
   Medical Board of California,                )
16 in her official capacity;                   )
   **RANDY HAWKINS, M.D.**, Vice President     )
17 of the Medical Board of California,         )
   in his official capacity;                   )
18 **LAURIE ROSE LUBIANO**, Secretary          )
   of the Medical Board of California,         )
19 in her official capacity;                   )
   **MICHELLE ANNE BHOLAT, M.D.,**             )
20 **M.P.H., DAVID E. RYU, RYAN BROOKS,**      )
   **JAMES M. HEALZER, M.D.,**                 )
21 **ASIF MAHMOOD, M.D.,**                     )
   **NICOLE A. JEONG,**                        )
22 **RICHARD E. THORP, M.D., VELING**          )
   **TSAI, M.D.**, and **ESERICK WATKINS**,    )
23 members of                                  )
   the Medical Board of California,            )
24 in their official capacities;               )
   and **ROB BONTA**, Attorney General of      )
25 California, in his official capacity,       )
                                               )
26           *Defendants*.                     )

27

28

**EXHIBITS ACCOMPANYING MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**Exhibit List**

| Exhibit No. | Description |
|---|---|
| A | Declaration of Tracy Beth Høeg, MD, PhD |
| B | Declaration of Ram Duriseti, MD, PhD |
| C | Declaration of Dr. Aaron Kheriaty |
| D | Declaration of Dr. Peter Mazolewski |
| E | Declaration of Dr. Azadeh Khatibi |
| F | Chris Hickie MD PhD (@HickieMd) Tweets of January 1, 2022 and August 9, 2022 |
| G | Chris Hickie MD PhD (@HickieMd) Tweet of August 10, 2022 |
| H | Taylor Nichols, MD (@tnicholsmd) Tweet of June 29, 2022 |
| I | Chris Hickie MD PhD (@HickieMd) Tweet of September 29, 2022 |
| J | Adrian Egli (@Adrian7745) Tweet of September 6, 2022 |
| K | Chris Hickie MD PhD (@HickieMd) Tweet of October 19, 2022 |
| L | Chris Hickie MD PhD (@HickieMd) Tweet of November 1, 2022 |

Exhibits Accompanying Motion in Support of
Preliminary Injunction

# Exhibit A

<u>Declaration of Tracy Beth Høeg, MD, PhD</u>

I, Dr. Tracy Beth Høeg, declare as follows:

1.      I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education and experience.

2.      I earned a Bachelor of Art in French with Honors at the University of Wisconsin-Madison in 2001. I received a Doctor of Medicine (M.D.) degree from the Medical College of Wisconsin in 2006, and a PhD in Epidemiology and Public Health from the University of Copenhagen in 2014. I completed my residency training (including service as a Chief Resident) in Physical Medicine and Rehabilitation (PM&R) at the University of California Davis in 2018, and a fellowship in Sports Medicine and Interventional Spine Medicine at the Bodor Clinic in 2019.

3.       Currently, I am a practicing PM&R Physician in Grass Valley, a California-based clinic. In conjunction with this, I also treat patients at Sacramento Surgical Institute, LLC, in Folsom, California.

4.      Additionally, I work as a Clinical Researcher at Acumen, LLC.

5.      I am also employed by the Florida Department of Health as a consultant epidemiologist and am currently doing voluntary epidemiological consulting with Marin County Health and Human Services.

6.      I am a citizen of Denmark and the United States and have active medical licenses in both California and Denmark.

7.      I have _testified_ before Congress about COVID-19 in children.

8.      I am a senior or first author of nine published epidemiological analyses of the COVID-19 pandemic, six of which have been published in peer-reviewed journals, with the remaining three currently in pre-print version.

9.      The COVID-19 studies I have been a co-researcher on have explored a number of topics, including the disease's transmission in schools, effectiveness of mask mandates, and risk-benefit analyses of COVID-19 mRNA vaccines in children and young adults.

10.     As a PM&R sports medicine and spine medicine physician, I see patients with a wide variety of complex health problems. I have worked for years to develop trusted relationships with my patients. I believe one of the reasons my patients place deep faith in me is that I am honest and transparent about their diagnoses, prognoses and potential treatments, and because prior to arriving at my recommendations, I take the time to thoroughly review the relevant scientific literature.

11.     Remaining up to date on the current scientific literature and analyzing the studies' methodologies and results is essential to the practice of medicine. We have learned through continued scientific inquiry that many treatments previously considered effective (surgeries, medications, etc.) actually may either not work as intended or, in some circumstances, cause more harm than benefit. The same goes for many types of diagnostic testing. Further, that many physicians are recommending a treatment does not necessarily mean it is backed by robust medical evidence or that we may not eventually learn the treatment is not indicated.  Progress in medicine relies on continuously challenging our current beliefs.

12.     Physicians should know the "truth" is not set in stone, but rather we have the opportunity to come closer and closer to a true understanding of both diseases and medical interventions through continuous investigation using, for example, robust epidemiological analyses and randomized controlled trials for interventions.  Indeed, it is the duty of every physician to remain informed of the most recent medical literature and potentially practice-

changing discoveries that could save or improve lives. It is also their job to admit uncertainty where high-quality evidence is lacking.

13.     The way the bill is worded, it will likely lead physicians to self-silence new data that may not be entirely aligned with "the consensus." Physicians who may be ahead of the curve or rapidly adopt new data into patient care may be unjustly punished. Alternately, physicians may feel pressure to state there is "a consensus" when there is none and those expressing appropriate nuance and uncertainty could be punished.

14.     I am going to give a few examples of the above, incorporating a number of my own research projects.

15.     I was the senior author on a seminal study on school transmission of COVID-19 published with the Centers for Disease Control (CDC) in their journal, Morbidity and Mortality Weekly (MMWR), and know first-hand the CDC was very slow in adapting their recommendation to the findings of our study and other studies in the US and internationally about the very low rate of in-school COVID-19 transmission, even at times of high community disease prevalence and no measurable effect on community disease levels.

16.     Had AB 2098 been in effect during the fall or winter of 2020-2021, a physician who advocated for, by discussing openly with their patients, the reopening of K-12 schools could have faced consequences in California under AB-2098.  And silencing those physicians may have led to an even longer delay in the reopening of public schools in California and additional negative impacts on children's education and well-being.

17.     Another controversial topic has been the masking of children. While the CDC and American Academy of Pediatrics (AAP) recommended masking of children ages 2 and above to prevent the spread of SARS-CoV-2, the European Centers for Disease Control (ECDC)'s stance

has been to only  recommend mask wearing for children over 12 in schools. The World Health Organization (WHO)  did not recommend masking for children under five years old, specifically stating, "Children of this age should not wear masks for a long duration."

18.     Many countries, (including Denmark where I hold citizenship, Sweden and Norway) never recommended masking children under the age of 12. Though there may have been the appearance of "consensus" in some locations, there was no international consensus on this issue, reflecting a difference of values in the face of a lack of robust evidence. Would a physician under AB-2098 risk losing their license for expressing nuance about an issue such as masking children for which international consensus is lacking?

19.     My own research has failed to find that masking children in schools had a detectable effect on SARS-CoV-2 disease transmission. One of these studies, which I published along with Economics professor at the University of Toronto, Ambarish Chandra, PhD, reanalyzed a very influential school mask mandate study published by the CDC, but our findings reversed theirs with the use of a larger cohort and longer duration study periods and was published in the highly-respected Journal of Infection. This demonstrated that with more robust epidemiological analyses, we can learn that what initial small studies apparently indicated might have been spurious and/or confounded and inappropriate bases for public health recommendations. As we are lacking randomized controlled trials of masking children, it is possible our understanding of this topic may continue to evolve. Thus, it is inappropriate to say that it is "settled science" that masking children 2 and above is effective at preventing the spread of SARS-CoV-2. Yet, under AB-2098, conceivably physicians could be penalized for saying as much.

20.     Likewise, a patient may want to know the effectiveness of community surgical mask wearing.  The two highest quality evidence studies we have (randomized controlled trials

from Bangladesh and Denmark) found no detectable benefit to those under 50 years old. The overall 11.1% effectiveness of surgical masking detected in Bangladesh, which was significant only in those 50 and over, may have actually been the result of statistically significant imbalances between the intervention and placebo groups, as was eloquently described in this peer-reviewed reanalysis, rendering any inference that the masks *caused* the 11.1% reduction inappropriate. There was no detectable benefit to the wearer of surgical masks in the randomized study from Denmark. In other words, we currently lack robust evidence that cloth or surgical community mask wearing effectively limit the spread of SARS-CoV-2.

21.     A generic statement that "masks work" at the very least obscures these findings, and in reality, simply does not reflect the current state of scientific knowledge.  Yet, I do not know if providing more nuanced but more accurate information may run afoul of the "scientific consensus," as interpreted by the Medical Board.  This puts a physician in a difficult position.

22.     Living in this persistent uncertainty about what one is allowed and not allowed to say makes practicing medicine ever-more challenging for physicians who truly want to give their patients full and honest information and simply do the best for them—as all physicians are ethically and legally obligated to.

23.     Another issue specifically addressed in the bill is COVID-19 vaccination. The recommendations for vaccinating and boosting children against COVID-19 currently vary internationally. Multiple European countries, including Sweden, Denmark, Norway and Finland are only recommending fall bivalent booster doses for those over 50-65 years or otherwise considered to belong to a high-risk group. The European CDC and European Medicine Agency has released a joint statement saying the updated boosters should be "directed as a priority" to those 60 years and older or high risk groups. Denmark has specifically stated children (under 18)

cannot get vaccinated against COVID-19 unless they have a medical evaluation from a physician who deems it advisable.

24.     In the US, the new bivalent booster is recommended for all children 5 and over if it has been 2 months since their last infection or vaccination. Simply put, we are currently in a situation where there is no international consensus on this issue and new <u>data from my own research group</u> found that the risk benefit ratio for vaccinating people 18-29 with a booster dose may be on average unfavorable when weighing COVID-19 hospitalizations prevented against serious adverse events and the risks of post-vaccination myocarditis. In this instance, following the so-called "consensus" could lead to unnecessary harms.

25.     The benefits and risks of the new bivalent booster in each age demographic and those with compared to those without prior infection are currently not well-defined. This puts physicians who are simply trying to give appropriate and individualized recommendations in a difficult position, particularly considering they may not know what the California Medical Board's "consensus" is at the moment or if it also evolves as our understanding evolves.

26.     Further, as the virus mutates and population immunity increases, we <u>have seen</u> vaccine effectiveness decrease in a way that has been difficult to predict and continues to rapidly change. We have also gained knowledge about the <u>likelihood</u> of severe adverse reactions to the COVID-19 vaccines, as well as <u>long-term implications</u> of post-vaccination myocarditis.

27.     This new information has changed and continues to change the risk-benefit calculations for each age, sex, and underlying health status demographic and for each dose of vaccination. A generic statement such as "the COVID-19 vaccine works" simply does not account for the complexity of the risk-benefit calculus. Such a statement is the opposite of individualized

medicine. Indeed, we physicians have a duty to give accurate information to our patients yet, under AB-2098, we may not have the freedom to do so.

28.     Additionally, the bill itself ironically contains demonstrably false information about COVID-19 vaccine effectiveness. The bill states "Data from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated."

29.      However, the CDC's own website states it is 6 times greater. And even this statistic should be tempered with the fact it relies on observational data, meaning it does not consider baseline differences in health between vaccinated and unvaccinated which would likely change this number. In short, the 11 times risk reduction in the bill is demonstrably false, but presumably a physician could punished for stating a different number that conflicts with the legislature's (demonstrably false) position.

30.     Because my primary duty is and will always remain the well-being of my patients, I will most certainly continue to tell them the truth about their conditions and treatments to the best of my ability. Nevertheless, since the passage of AB 2098 I have found myself in a difficult position.  I am afraid of saying something to my patients that I know is consistent with the current scientific literature but may not yet be accepted by the California Medical Board. Physicians must feel free to speak truthfully with their patients if they wish to gain and maintain their trust.

31.     As there is also no international consensus on many of these issues, legislating the concept of a "scientific consensus" in light of our evolving understanding outlined above is misguided and unworkable.

32.     In response to the controversial nature of my published research described above, physicians online have *already* threatened to report me to the California Medical Board multiple

times.  Some of these threats specifically and pointedly referred to the then-anticipated passage of AB 2098. Some threats have followed the passing of the bill to law.

33.     Because of the personal attacks and threats, I have grown fearful that decoy patients are being sent to me simply to ask controversial or difficult questions with the intent of reporting me.  This fear is interfering with the sacred doctor-patient relationship that I and so many other physicians value so greatly.

34.     Although I realize that speaking out against this law comes at a great personal risk to me, I am writing this declaration out of respect for my patients and for the people of the state of California.

35.     I swear or affirm under penalty of perjury that the foregoing is true and correct.


Dated: 10/31/2022


Signature   _tracy hoeg_____

# Exhibit B

Declaration of Ram Duriseti, MD, PhD

I, Dr. Ram Duriseti, declare as follows:

1.   I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education and experience.

2.   I am a practicing Emergency Physician. I have worked in both Community and Academic high-volume settings as an attending physician for 22 years. I completed my Bachelor of Science and Bachelor of Arts degrees at Stanford University in 1991. I received my Doctor of Medicine (M.D.) degree from the University of Michigan Medical School in Ann Arbor in 1996 with highest honors and was elected to the Alpha Omega Alpha Medical Honor Society. In 2007, I received a PhD in Engineering from Stanford University.  My dissertation and subsequent research and publications focused on computational modeling of complex decisions and, in particular, optimizing complex medical decisions.

3.   I have been a practicing attending Emergency Physician since 2000 with the Stanford Department of Emergency Medicine and at Mills-Peninsula Hospital in Burlingame and became a Diplomate of the American Board of Emergency Medicine in 2001. At Stanford Hospitals and Clinics, my focus is Pediatric Emergency Medicine.

4.   I am a volunteer with an organization called Urgency of Normal. The organization is a group of physicians, researchers, children's advocates who have developed analyses and "toolkits" to help facilitate safe school openings and return to normalcy for children after extensive national disruptions since March 2020. We emphasize the use of data and supporting literature. I have provided the organization with extensive analysis from primary CDC COVID-related data. I have published and/or have pending several studies on COVID-related issues including a numerical

paper analyzing Emergency Department utilization disparities in access during COVID[1],  formal methodological comments on COVID-related journal articles[2], have a publication pending[3], have a manuscript in progress re-analyzing a Mask RCT using random effects regression combined with Monte-Carlo methods,[4] have a manuscript in progress with an econometrics team at Ljubljana University in Slovenia,[5] am working with a Bay Area County Public Health department designing and implementing statistical analysis software ("R-package") to process the County's COVID data with a plan to publish our analysis of their data[6], and will be embarking on a funded research project to examine surgical mask and N95 filtration efficacy for sub-micron aerosols (where most viable infective virions live) with collaborators at a Canadian University.[7] I have also authored and co-authored OpEds on COVID policy matters[8,9], have testified before the California State Legislature Health Committee and have met with various State Senators about COVID policy.

5.    Since March of 2020 (and likely earlier), I have treated hundreds of COVID patients. Over the last three years, I have read and analyzed hundreds of journal articles on COVID and related topics, co-authored academic analyses of COVID mitigation policies and their impacts and written multiple evidence-based expert declarations on COVID related topics submitted to national courts.

---

[1] https://pubmed.ncbi.nlm.nih.gov/34125026/
[2] https://publications.aap.org/pediatrics/article/doi/10.1542/peds.2022-056687/185379/School-Masking-Policies-and-Secondary-SARS-CoV-2  and
https://publications.aap.org/pediatrics/article/149/6/e2022056288/185413/Integrating-SARS-CoV-2-Antibody-Results-in?
[3] Child mask mandates for SARS-CoV-2: A systematic review" co-authored by invitation and under review by a peer-reviewed journal
[4] Manuscript in progress with JD Haltigan, PhD and Kim Colyvas, MS
[5] European Bank funded project analyzing the economic impact and benefits of NPIs in the European Union. Senior author Velimir Bole, PhD.
[6] County-specific information can be provided upon request if information is kept under seal
[7] Name of University and collaborating researchers can be provided upon request if kept under seal
[8] https://www.newsweek.com/were-physician-mathematician-data-scientist-n95s-wont-work-kids-opinion-1672207
[9] https://www.newsweek.com/we-need-stop-indiscriminately-testing-covid-its-harming-our-kids-opinion-1699723

6.    Treating patients involves communicating with them and making judgments about treatment that are based on a patient's individual circumstances, and the physician's knowledge and expertise acquired during clinical, educational, research, and professional experiences. Treating COVID patients is no different.

7.    As a doctor, I am well aware that the term "scientific consensus" is problematic and represents a misunderstanding of the scientific process itself.  First, what is considered "consensus" one day may turn to be the wrong approach. There are innumerable examples in a wide variety of medical domains, but I will proceed to provide several examples as they pertain to COVID.

8.    For example, at the beginning of this pandemic, severe COVID patients were subjected to early intubation as a means to "protect health care workers,"[10] but as scientific knowledge and understanding of the disease evolved, we have moved away from invasive ventilation as a primary intervention. When the "consensus" was still settled on intubation, I put my patients' well-being first and advocated for non-invasive ventilatory support whenever clinically safe and feasible. Though my approach later proved to be correct, because at the time that I administered this treatment it was contrary to "consensus" my clinical advocacy could have been subject to professional sanctions had AB2098 been the law.[11]

9.    Second, consensus can vary depending upon the group authorized to set a policy. Professionals who dissented from government health officials have been silenced and some platformed experts who are vocal about what they deem to be misinformation may not be as informed on the topics in question as those they consider misinformers. Put otherwise, there has

_____

[10] https://www.wsj.com/articles/hospitals-retreat-from-early-covid-treatment-and-return-to-basics-11608491436
[11] https://economictimes.indiatimes.com/industry/healthcare/biotech/healthcare/as-virus-advances-doctors-rethink-rush-to-ventilators/articleshow/75401919.cms?from=mdr

frequently been a perception of consensus on prevention and treatment of COVID that does not actually exist or is actively in flux (e.g., efficacy of cloth masks).

10.   Likewise, knowledge of efficacy of treatments for Covid-19 is constantly evolving.

11.   While I have *never* recommended Ivermectin or Hydroxychloroquine to a COVID patient in opposition to established recommendations at the time, few are aware that the FDA initially granted an EUA for Hydroxychloroquine for COVID in March 2020[12] or that there is an active NIH funded randomized controlled trial (RCT) looking at a longer and higher dosing regimen of Ivermectin to treat COVID.[13]

12.   Remdisivir, a proprietary drug from Gilead Pharmaceuticals that we still use in hospitalized COVID patients, received an FDA EUA in May 2020 and final approval in October 2020. And yet not many—including physicians and other experts—know that the largest RCT of Remdisivir from the WHO demonstrated no beneficial effect.[14]

13.   This is all to say, after less than three years of dealing with Covid-19, there are many unknowns, and the "consensus" at any given moment may turn out to be incorrect (sometimes within months).

14.   While there is no doubt that the COVID vaccines have saved lives in immune naïve individuals at notable risk of severe disease, the knowledge of both the benefits and risks posed by vaccines has continued to evolve. For example, until June 2021, the "consensus" was that individuals vaccinated against COVID were not capable of spreading the virus and that myocarditis was not a known complication of COVID mRNA vaccines.  On both accounts the "consensus" quickly proved incorrect.  Indeed, as was noted during the December 2020 VRBPAC

---

[12] https://www.fda.gov/media/136534/download
[13] https://activ6study.org/study-results/
[14] https://www.nejm.org/doi/full/10.1056/nejmoa2023184

meeting, it turns out that any "consensus" on transmission reduction could not have emerged from the trial.[15]

15.   Now 2 years later, is now widely acknowledged that while there are clear benefits to COVID vaccines for at risk individuals, they do not eliminate transmission and may only transiently mitigate transmission risk. Furthermore, both contemporaneous and subsequent data has confirmed that COVID vaccines have a quantifiable risk of myocarditis.[16] As a physician-scientist who meticulously read the Pfizer clinical protocol[17] and the subsequent EUA submission[18] (including severe outcomes data on page 31), reviewed the December 2020 VRBPAC transcription discussing evidence of transmission reduction[19], stayed informed on the international post-vaccination infection data and performed an unpublished numerical analysis of VAERS data in May of 2021 for my benefit and that of my family *and friends who asked for my opinion*, I understood these risks earlier than many others.  However, had AB2098 been in effect at the time, I could have been accused of spreading "misinformation" subject to investigation and professional sanctions had I shared my early accurate understandings with any patients.

16.   AB2098 will preclude me from properly and freely communicating with and treating my patients according to my best judgment because it places me in jeopardy of being reported for potentially giving a patient advice that doesn't match the "consensus" of the day, even if it is later shown that the "consensus" was incorrect. Indeed, as evidenced below, proponents of the bill appear intent on stifling even academic debate and are willing to engage in personal attacks to meet this goal. Even if no formal sanction is imposed, the process itself involves significant costs

---

[15] https://www.fda.gov/media/144859/download  (page 342)
[16] https://www.science.org/content/article/israel-reports-link-between-rare-cases-heart-inflammation-and-covid-19-vaccination
[17] https://cdn.pfizer.com/pfizercom/2020-11/C4591001_Clinical_Protocol_Nov2020.pdf
[18] https://www.fda.gov/media/144245/download
[19] https://www.fda.gov/media/144859/download (page 342)

and reputational harms, including having to report being subject to this process to every other licensing authority and any hospital where privileges are being renewed or newly sought.

17.   There is no precedent for a law that prevents doctors from communicating openly with their patients and giving what they believe to be the best possible advice for their circumstances.

18.   Unfortunately, there are physicians who are vocal AB 2098 advocates, who have publicly threatened me and others (especially other Urgency of Normal doctors and/or my research collaborators) by implying that they will negatively impact our professional standing (*See* Attachments A and B).

I swear or affirm under penalty of perjury that the foregoing is true and correct.



_____

Dated:  October 20, 2022

# Exhibit C

## DECLARATION OF DR. AARON KHERIATY

I, Dr. Aaron Kheriaty, declare as follows:

1. I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education, and experience.

2. I completed my undergraduate studies at the University of Notre Dame and earned a Bachelor of Arts degree with a double major in philosophy and pre-medical sciences in 1999. I earned my Doctor of Medicine (M.D.) degree from Georgetown University in 2003 and completed residency training in psychiatry at the University of California Irvine. For many years, I was a Professor of Psychiatry at UCI School of Medicine and the Director of the Medical Ethics Program at UCI Health, where I chaired the ethics committee. I also chaired the ethics committee at the California Department of State Hospitals for several years. I am now a Fellow at the Ethics & Public Policy Center in Washington, DC, where I direct the program on Bioethics and American Democracy. I am also chief of psychiatry and ethics at Doc1 Health and chief of medical ethics at The Unity Project. I am a senior fellow and director of the Health and Human Flourishing Program at the Zephyr Institute. I serve as a scholar at the Paul Ramsey Institute and on the advisory board at the Simone Weil Center for Political Philosophy.

3. In addition to publishing several peer-reviewed medical and bioethics papers, I have authored numerous books and articles for professional and lay audiences on bioethics, social science, psychiatry, religion, and culture. My work has been published in the Wall Street Journal, the Washington Post, Arc Digital, The New Atlantis, Public Discourse, City Journal, and First Things. I have conducted print, radio, and television interviews on bioethics topics with The New York Times, the Los Angeles Times, CNN, Fox News, and NPR.

4.   During the early months of the Covid-19 pandemic, I co-authored the University of California's pandemic ventilator triage guidelines for the University of California's ("UC") Office of the President and consulted for the California Department of Public Health on the state's triage plan for allocating scarce medical resources.   In early 2021, when the demand for vaccines outstripped supply and there were ethical questions about who should get the vaccines first, I was involved in developing the UC vaccine-allocation policy.  I also served as a psychiatric consultant at the UCI hospital and, in connection with treating patients at the hospital, I contracted Covid-19 in 2020. I am now in private practice as a psychiatrist in California where I continue to treat patients.

5.   AB 2098 will harm patients, hamstring our pandemic response, destroy the trust necessary for the doctor-patient relationship, and worsen the physician shortage in California. Most egregiously, the bill violates the First Amendment free speech rights of physicians.

6.   A physician with a gag order – a physician who cannot say what he or she thinks – is not a physician that can be trusted. Patients want to know that if they ask their physician a question, including a question about Covid, they will get their doctor's honest opinion—regardless of whether the patient follows that opinion, seeks a second opinion, declines to act on that opinion, etc. Patients will not trust physicians if they believe their doctor is simply parroting a consensus judgment that he or she may or may not endorse.

7.   Science evolves constantly: the text of AB 2098 makes three statements about Covid and Covid vaccines that are already outdated:

(1) The death count figures cited are overestimated by failing to distinguish dying *from* COVID and dying *with* Covid;

(2) the efficacy of vaccines has declined with time and new variants, so the vaccine efficacy statistic cited in the law is no longer true of the vaccines against Omicron variant;

(3) new COVID vaccine safety issues have come to light with emerging research.

8.  Safety and efficacy findings are subject to change over time. For example, a study in the *New England Journal of Medicine* showed *negative vaccine efficacy* against the Omicron variant. Another recent peer-reviewed study found reduced sperm counts in men after vaccination, and yet another study revealed that mRNA is excreted in the breastmilk of lactating women, raising safety concerns for nursing newborns. These findings were unavailable when this law was drafted. Physicians should be able to share these concerns with their patients.

9.  Advances in science and medicine typically occur when doctors and scientists challenge conventional thinking or settled opinion. Fixating any current medical consensus as "unassailable" by physicians will stifle medical and scientific progress. As I testified in January at a U.S. Senate panel on Covid policy: "The scientific method suffered [during the pandemic] from a repressive academic and social climate of censorship and silencing of competing perspectives. This projected the false appearance of a scientific consensus—a 'consensus' often strongly influenced by economic and political interests."

10. Over the last two years public health recommendations and "consensus" with respect to Covid changed frequently as new information became available. Frontline physicians played a key role here in advancing knowledge of COVID treatments—including changing guidelines on ventilating patients, the use of high dose steroids in hospitalized patients, and identifying previously unknown or overlooked safety issues with some novel antiviral therapies. As with the rest of medical science, *yesterday's minority opinion often becomes today's standard of care.*

11. Good science is characterized by conjecture and refutation, lively deliberation, often fierce debate, and always openness to new data. AB 2098's censorship of free inquiry and free speech spells not only the demise of civil liberties and constitutional rights for physicians in CA, but the end of the scientific enterprise when it comes to dealing with covid in my home state.

12. Physicians who are negligent and commit malpractice (for example, a doctor who advises a patient to inject himself with bleach to treat COVID) are already subject to tort lawsuits and disciplinary actions by the medical board under existing state law. For example, under existing law the Board is already empowered to investigate, and if necessary, take enforcement actions against "any physician and surgeon where there have been any judgments, settlements, or arbitration awards requiring the physician and surgeon or his or her professional liability insurer to pay an amount in damages in excess of a cumulative total of thirty thousand dollars."  Cal. Bus. & Prof. Code § 2220(b).

13. Given the already broad powers of the Board, AB 2098's real purpose is to silence doctors who disagree with the public-health establishment on controversial subjects on which there is ongoing substantial disagreement and debate – thus constraining these physicians' free speech rights.

14. AB 2098's provisions are vague and do not provide sufficient guidance to doctors with respect to what information can and cannot be shared with patients. For example, it provides no meaningful definition or operational criteria to determine the "current scientific consensus," which as already discussed may be rapidly changing. Indeed, the Governor of California himself recognized this problem when, while signing the AB 2098 into law he attempted to limit its reach by directing the Board to punish only "those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care while interacting directly

with a patient under their care." Whether the Board will or won't follow Governor Newsom's exhortations remains to be seen, but in the meantime, physicians will have no way of knowing whether a statement to a patient, even one based on recent peer-reviewed scientific studies, will draw scrutiny from the Medical Board for challenging the public health establishment's preferred policy goals. The law will thus have a chilling effect on the speech of not only the doctors who are charged or disciplined under the law but all physicians in California who advise patients on COVID-related matters.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated:  October 18, 2022                                      Signed: /s/ *Aaron Kheriaty*

**Exhibit D**

## DECLARATION OF DR. PETER MAZOLEWSKI

I, Dr. Pete Mazolewski, declare as follows:

1.   I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education, and experience.

2.   I received a Bachelor of Science degree from the University of California at Los Angeles (UCLA) in 1990 and a medical degree (M.D.) from the University of Southern California in 1994.

3.   I completed a 7-year internship, residency, and research fellowship at the University of Nevada in 2001.

4.   I also served in the military for many years, attaining the rank of Colonel in 2017.

5.   I have been a private practice clinician for over 20 years, and currently work as a general and trauma surgeon for John Muir Health, handling the highest volume of acute and general trauma surgeries while never having had a lawsuit filed against me.

6.   I have published extensively on various subjects related to my areas of expertise.

7.   In taking care of a multitude of emergency surgical patients, I cannot rely on the "contemporary scientific consensus with regards to the standards of care."

8.   It can take 12-17 years for widely accepted published findings to be incorporated into clinical practice, and patients in need of treatment cannot wait that long for a change in the "contemporary scientific consensus."  Rather, they need my expertise, based on the entirety of my education, review of the literature, and professional experience.

9.   As an example, I was taught in the 1990's that every appendicitis is to be operated on as quickly as possible.  But by around 2000, it became clear to me that immediate appendectomy should not be the standard treatment for all patients diagnosed with appendicitis, as those with complicated cases have far too high a complication rate following surgery; new literature was

showing that this high risk from surgery could be mitigated by early antibiotic therapy and a delayed "interval" appendectomy.

10. This was not an easy change, as it came with an abundance of peer pressure because I was deviating from the "scientific consensus."  However, I did not waiver and persisted with this non-operative approach because I knew it was in my patients' best interests, and I had no fear of losing my license because what I was doing was fully supported by the literature.

11. Today, non-operative treatment of complicated appendicitis is a well-accepted and recognized form of treatment.

12. In other words, science is always evolving and starts with the clinician who recognizes an improvement over the standard of care and implements that into his or her practice.  This new approach then undergoes scrutiny with rigorous clinical trials which can take years to complete, and by virtue, the "contemporary scientific consensus" lags behind what is being observed by the physician treating patients every day.

13. Covid-19 is no different.  With such a new "naïve" disease, the only "scientific consensus" at the time was that there was no scientific consensus.  Since clinicians were not presented with any outpatient treatment options, they had to find novel treatments on their own, leading to broad treatment regimens.

14. The passage of AB 2098 jeopardizes the ability of physicians like me to treat patients according to our best judgment, which is our professional obligation.

15. The threat of discipline for providing advice that does not comport with the "contemporary scientific consensus" puts me and many other doctors in fear of providing such treatment (which then results, ironically, in substandard care).

16.  If this law is permitted to stand, it sets a dangerous precedent of allowing legislators to strip physicians of their ability to treat their patients as best they see fit in any number of contexts—there is no reason to believe that this type of legislation will be limited to Covid-19, although even restricted to that context it is problematic.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated:  October 21, 2022                                    Signed: /s/ *Peter J. Mazolewski*

**Exhibit E**

I, Dr. Azadeh Khatibi, MD, MS, MPH, declare as follows:

1.      I am an adult of sound mind and make this statement voluntarily, based upon my knowledge, education, and experience.

2.      I am a board-certified, fellowship-trained physician. I received my Bachelor of Science at University of California, Los Angeles, with a major in Molecular, Cell, and Developmental Biology in 2001. I graduated *Phi Beta Kappa* with Departmental Honors and College Honors.

3.      I entered medical training as one of twelve students in the UC Berkeley-UC San Francisco (UCSF) Joint Medical Program. I received my medical degree from UCSF in 2007. I also obtained a Master of Public Health (MPH) degree in 2003, and another masters in Health and Medical Sciences in 2004, both from University of California, Berkeley.

4.      After graduating from medical school, I completed an Internal Medicine internship at Alameda County Medical Center in affiliation with UCSF. I completed my residency in ophthalmology at the University of California, Irvine, where I was selected to be Chief Resident. I completed fellowship in Vitreo-Retinal Disease and Surgery at University of California, San Diego, where I received the Outstanding Teacher Award both years of my training.

5.      I have cared for numerous patients with infectious disease. I have discovered and named a disease and published scholarly articles in peer-reviewed journals. I've worked both in private practice and as a doctor providing care for patients in a large health maintenance organization. I have been licensed by the Medical Board of California since 2009. I have never had a complaint or been investigated by any medical regulatory body.

6.      I am also a patient. I had a serious life-threatening illness, and was given a 25% chance of being alive in five years. I also have immune system issues as a result of this illness.

7.      AB 2098 declares it "unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19…" The bill further defines "misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."

8.      In medical terms "consensus" refers to the general opinion of a group of doctors. There is informal consensus opinion among doctors, and also formal consensus opinion, where a group of doctors with expertise in a particular topic come together to amass, discuss, and debate the evidence around a topic, arrive at some conclusions for general patient care guidelines and publish them. Even in this formalized setting, not all participants may agree with the ultimate conclusions and recommendations in whole or in part.

9.      The process of creating formal consensus guidelines for publication involves disagreement between doctors. In fact, "disagreements [in developing consensus guidelines] can shed light on areas of controversy and launch further discussions."[1] It is natural and normal for doctors to disagree on what is best for individual patients, or even groups of patients.

10.     In fact, medical advancement starts with questioning and exploring beyond, and sometimes against, consensus opinion. In free societies throughout modern history, doctors have had the liberty to contradict both informal and formal consensus in treating their individual patients, whose cases may not be suitable for conforming to general guidelines or may not align with methods and outcomes of particular studies.

11.     Furthermore, consensus—whether formal or informal—is always catching up to the latest emerging evidence or thought frameworks, and thus is always behind the cutting edge.  Indeed, the best studies that are accepted for publication in the top reputable medical or scientific journals are often ones that provide new information, either beyond or contrary to the accepted knowledge. AB 2098 does not define "consensus," nor does it account for the fact that consensus lags behind the latest emerging evidence or thought framework. This creates serious problems for doctors who know that newer studies and thought frameworks provide information and guidance that may be useful to their patients, and also know that they may face legal investigation and punishment if this information differs from "consensus," but they present it to their patients anyway.

12.     The limitations that AB 2098 places on physicians is contrary to the ethical duties inherent in medical practice, because ethical practice of medicine sometimes requires questioning and disagreeing with consensus.

13.     During my time as a physician and as a patient, my doctors and I took the approach that was the opposite of "consensus" opinion, including formal published consensus, multiple times. It is because my doctors and I chose, in treating my specific case, to proceed in a different way than "consensus" would dictate, that I believe I am alive today.

14.     As may be discerned from the above, this is extremely personal to me.  When I was diagnosed with a life-threatening condition and given only a 25% chance of surviving five years, my doctor and I went against the "scientific consensus" in creating my treatment plan. The "consensus" opinion and standard of care among the doctors in multiple specialties was that I should avoid a very aggressive treatment.

15.     Even after getting multiple consultations inside and outside my health system, only one outside doctor, whose speech about treatments and therapies he offers does not always track the "consensus" medical opinion, suggested a very aggressive therapy. After hearing his medical opinion, I decided against the "consensus" recommendation and opted for the most aggressive, "non-consensus" treatment protocol recommended by him.

16.     I am happy to report that not only did I live, but my results were remarkable, to the surprise and delight of all my doctors. Other doctors were eager to find out my protocol when they realized I was doing so well. Ironically, my original doctor (who recommended "consensus" treatment) remarked they may now try more aggressive therapies on other patients, in hopes they, too, may have a better chance of staying alive.

17.     If the lone doctor had been afraid of getting investigated or having his license revoked for suggesting a "non-consensus" opinion, I wouldn't have heard about options for aggressive treatment. Had my doctor's speech been chilled to only advise and offer "consensus" treatments, I might not be alive today. Moreover, the medical advancements that come from noticing my excellent results and then applying it to others would have never happened.

18.     Doctors and I also bucked formal medical consensus opinion published by an expert panel when we pursued laboratory tests for myself and a family member.  The results of the lab testing, which may not have occurred had the doctors feared punishment for going against published consensus, bore life-changing results.

19.     In my own medical practice, when I was a fellow at University of California, San Diego, I went against group "consensus" standards, including that of my supervising physicians at the university and surrounding areas. At the time, the majority of the doctors in my city were prescribing antibiotics after intravitreal injection. I determined, based on emerging evidence, my own lab research on injections, and knowledge of antibiotics and resistance, that giving antibiotics after eye injection was likely causing more harm than good, so I stopped routine antibiotic usage with my patients and advised them against it.

20.     All around me, doctors were doing the opposite —I was alone in my treatment recommendations. Finally, months later, at a university conference, one of the attendings physicians brought up this issue, and the physicians agreed as a group that they would no longer give antibiotics after injections.

21.     I mentioned at the meeting that I hadn't been giving antibiotics for months. I was ahead of the pack. If there had been a law that said with regard to ophthalmology or eye injections (as there is with AB 2098 and Covid-19) that I must only follow consensus standards of care, I would have been fearful of adopting this "non-consensus" approach, with worse results for my patients, and other patients as well.

22.     I became concerned about self-censoring by my fellow physicians starting in Spring 2020, and this concern has steadily grown over the past several years. A number of my colleagues have confided their views to me, agreeing that censorship is a problem, that the situation has gotten "crazy," "ridiculous" and "bizarre," that they are afraid to speak out, and that they are glad that I am speaking up and support me in doing so. Among my physician colleagues and in the medical system more generally, I have observed hesitancy, fear, and emotional dysregulation around Covid-19 and speech.

23.     My own doctor told me that she feels as though she's practicing under "communism".

24.     Furthermore, she refused to write a school letter stating medical facts and her assessment—something doctors do for patients all the time for other illnesses—about skin infections caused by masking, saying that she does not "get involved in politics." Doctors who don't agree with certain medical conclusions or messaging by governmental institutions, professional organizations, certain mainstream news narratives, or their own employers, are afraid to speak out lest they lose their jobs or get harassed or investigated.

25.     I, myself, was threatened by someone on social media, who stated "I will take great pleasure in seeing #AB2098 become law and seeing your license to practice medicine in California gone!" The situation is toxic to free speech, and to medicine.

26.     In conversation with me, a member of the Medical Board of California confirmed that it was the Board itself that crafted the particularly broad problematic legislative language. At the same time, this individual could not explain why the Board chose the term "consensus" instead of, for example, "evidence-based medicine"—a term with known meaning, one that encompasses both majority and minority opinions, and that describes how medicine should be practiced.

27.     The Board member also confirmed that the Board holds different doctors to different practice standards based on their individual circumstances. In the context of AB 2098, this is concerning because this practice gives the government authority to differentially police speech of individual doctors. This practice opens the door to labeling certain doctors as holding "non-consensus" opinions based on nothing more than vague and loose definitions and standards that the Board may determine on whatever basis it chooses. This lack of standardization will allow the Board to preferentially target doctors who hold opinions the government and its institutions disagree with.

28.     With the enactment of AB 2098, the state becomes the arbiter of who is allowed to say what and to what extent. Furthermore, this variability in the government limiting physicians' speech on a case-by-case basis based on their own definitions and standards further chills speech of all physicians as a whole, because physicians will be afraid to speak lest they exceed what the government deems as appropriate speech for their specific cases. This leads to large-scale self-censoring.

29.     In medical ethics, doctors are required to have a fiduciary relationship with each patient and act on principles of beneficence and non-maleficence. AB 2098's coercing doctors to conform their speech to only the state's ill-defined "consensus" determinations would affect doctors' ability to practice medicine ethically. If they feel coerced to not state their true medical opinion with their patients, then they are no longer acting as their patient's fiduciary. This is highly unethical.

30.   With AB 2098 in place, doctors disagreeing with what they perceive as the general informal "consensus," or even formal published "consensus" opinion, will not feel free to state their medical opinion because they will be afraid of being investigated or losing their license. Medical Board investigation can be a long, drawn-out, multi-year, exorbitantly expensive process, and may ruin a physician's reputation irrespective of the ultimate outcome.  These investigations put tremendous stress on doctors and their families, take time and attention away from patients, as well as put a financial toll on doctors from legal fees. Rather than subject themselves to the possibility of being investigated, most doctors will limit their speech about Covid-19. We cannot make it illegal for doctors to speak against consensus when it comes to Covid-19.

31.   As a patient with immune system issues, AB 2098's language around "consensus" directly interferes with my right to hear opinions about Covid-19 based on my doctors' real unfiltered medical judgment. I rely on my doctors to give me their true medical opinions. Since this law coerces them to limit their speech so as to conform to some ill-defined "consensus," I will lose access to their true medical opinions. I will no longer be able to trust my doctor's speech because I will not be confident that I will be getting a true medical opinion, instead of a fear-based medical narrative acceptable to the government.

32.   Lastly, AB 2098 impedes scientific curiosity, questioning, openness and investigation, which require free speech. Consequently, I and other patients no longer have access to speech that would advance medicine. AB 2098 would thus stunt medical free-thinking, advancement, and put lives at risk.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: October 27, 2022

Signed:

1.   Kea B, Sun BC. Consensus development for healthcare professionals. Intern Emerg Med. 2015 Apr;10(3):373-83.

**Exhibit F**



**Chris Hickie MD PhD** @HickieMd · Jan 1 ···

You aren't a very good "epi" are you? No. You are horrible and want people to die from covid-19 infection pushing your anti-vaccine and anti-mask agendas. You deserve to lose your medical license, Hoeg.

> precluded an evaluate of risk. Given our observation that risk is largely confined to males under the age of 40 years further research is needed pooling data from international studies to evaluate further the risks in children.
>
> In summary, the risk of hospital admission or death from myocarditis is greater following COVID-19 infection than following vaccination and remains modest following sequential doses of mRNA vaccine including a third booster dose of BNT162b in the overall population. However, the risk of myocarditis following vaccination is consistently higher in younger males, particularly following a second

  ♡ 



**Chris Hickie MD PhD** @HickieMd · Aug 9 ···

Replying to @TracyBethHoeg

I look forward to reporting you to your medical board once a certain law is passed in California.

**Exhibit G**



# Chris Hickie MD PhD
@HickieMd



@michaelmantzmd @TracyBethHoeg Since you are also in California, Mantz, I can report you now alongside quack Hoeg for spreading medical disinformation once that law passes in California. Two quacks in a quandary.

10 Aug 2022 • 11:10

**Exhibit H**



**Tracy Høeg, MD, PhD** @TracyBethHoeg · Apr 28

My latest op-ed for @SFGate on California's new bill which would punish physicians for spreading covid misinformation. Though ostensibly done to protect patients, it will stifle scientific debate, interfere w/the doctor-patient relationship & further erode trust in public health.

>  **SFGATE** ✔ @SFGate · Apr 28
>
> A California physician argues against the state's COVID-19 misinformation bill. dlvr.it/SPPJlb

 43          ↻ 225          ♡ 634           



**Taylor Nichols, MD**
@tnicholsmd

Replying to @TracyBethHoeg

# Why so defensive, Tracy? Scared?

9:19 AM · Jun 29, 2022 · Twitter for iPhone

**Exhibit I**



**Aaron Kheriaty, MD** @akheriaty · Sep 29

The Covid mass vaccination campaign will one day be seen as one of the most reckless misadventures in the history of modern medicine.

💬 2,154          🔁 7,000          ♡ 30.9K          ⬆



**Chris Hickie MD PhD**
@HickieMd

Replying to @akheriaty

# Can't wait to see you lose your license.

6:29 PM · Sep 29, 2022 · Twitter for Android

**Exhibit J**



**Adrian Egli**
@Adrian7745

···

Replying to @AzadehKhatibi and @MedBoardOfCA

I will take great pleasure seeing #AB2098 become law
and seeing your license to practice medicine in
California gone!

search.dca.ca.gov/details/8002/A...





**MEDICAL BOARD OF CALIFORNIA**

**LICENSING DETAILS FOR: A 106465**

**NAME:** KHATIBI, AZADEH
**LICENSE TYPE:** PHYSICIAN AND SURGEON A
**PRIMARY STATUS:** LICENSE RENEWED & CURRENT ⓘ
**SCHOOL NAME:** UNIVERSITY OF CALIFORNIA SAN FRANCISCO
SCHOOL OF MEDICINE
**GRADUATION YEAR:** 2007

**ADDRESS OF RECORD**

PO BOX 642082
LOS ANGELES CA 90064-7082
LOS ANGELES COUNTY
MAP

[ALT]

10:13 AM · Sep 6, 2022 · Twitter Web App

**Exhibit K**

**Chris Hickie MD PhD**
@HickieMd

Replying to @TracyBethHoeg

If you are still licensed in California on Jan 1, 2023 when AB2098 becomes law, you are being reported to the Medical Board of California for spreading medical disinformation as a physician.  Any physician with half a brain knows this "signal" was deaths from delta surge.



2:54 AM · Oct 19, 2022 · Twitter Web App

**Exhibit L**



**Chris Hickie MD PhD** @HickieMd · 22h

Replying to @Doctor_Eric_B

Please ask @ABPMR and @ABMSCert  to sanction Hoeg for disinformation in pediatrics, including COVID-19.

💬          ⟲          ♡ 1          ↑