ROB BONTA
Attorney General of California
STEVE DIEHL, State Bar No. 235250
ANYA M. BINSACCA, State Bar No. 189613
Supervising Deputy Attorneys General
MEGAN O'CARROLL, State Bar No. 215479
KRISTIN A. LISKA, State Bar No. 315994
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3916
  Fax:  (415) 703-5480
  E-mail:  Kristin.Liska@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **TRACY HØEG, M.D., Ph.D., RAM DURISETI, M.D., Ph.D., AARON KHERIATY, M.D., PETE MAZOLEWSKI, M.D., and AZADEH KHATIBI, M.D., M.S., M.P.H.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**GAVIN NEWSOM, Governor of the State of California, in his official capacity; KRISTINA LAWSON, President of the Medical Board of California, in her official capacity; RANDY HAWKINS, M.D., Vice President of the Medical Board of California, in his official capacity; LAURIE ROSE LUBIANO, Secretary of the Medical Board of California, in her official capacity; MICHELLE ANNE BHOLAT, M.D., M.P.H., DAVID E. RYU, RYAN BROOKS, JAMES M. HEALZER, M.D., ASIF MAHMOOD, M.D., NICOLE A. JEONG, RICHARD E. THORP, M.D., VELING TSAI, M.D., and ESERICK WATKINS, members of the Medical Board of California, in their official capacities; and ROB BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | Case No. 2:22-cv-01980-WBS-AC<br><br>**OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:  January 23, 2022<br>Time:  1:30 p.m.<br>Dept:  5<br>Judge:  The Honorable William B. Shubb<br>Trial Date:  Not scheduled<br>Action Filed:  11/01/2022 |

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................. 1

Factual and Procedural Background ............................................................................ 1

    I.     Regulation of Medicine in California ................................................... 1

    II.    AB 2098 ................................................................................................. 3

    III.   Plaintiffs' Challenge to AB 2098 ......................................................... 5

Legal Standard ............................................................................................................. 6

Argument ..................................................................................................................... 6

    I.     Plaintiffs Have Not Shown a Likelihood of Success on the Merits ...................... 6

        A.    Plaintiffs Lack Standing ............................................................. 6

        B.    Plaintiffs Are Unlikely to Succeed on Their Free Speech Claim.............. 10

             1.    AB 2098 Is a Permissible Regulation of Professional Conduct ....................... 10

             2.    AB 2098 Is a Permissible Regulation of the Care Provided by Medical Professionals ............... 14

             3.    AB 2098 Withstands Strict Scrutiny ............................................. 16

                  a.    AB 2098 Furthers a Compelling Government Interest.............. 16

                  b.    AB 2098 Is Narrowly Tailored to Serve Those Compelling Interests ............. 18

        C.    Plaintiffs Are Unlikely to Succeed on Their Void for Vagueness Claim............. 19

    II.    The Remaining Factors Weigh Against Injunctive Relief ................................. 21

Conclusion ................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

CASES

*Arce v. Douglas*
793 F.3d 968 (9th Cir. 2015) ..................................................................................... 19

*Arnett v. Dal Cielo*
14 Cal. 4th 4 (1996) ............................................................................................... 1, 2

*Avivi v. Centro Medico Urgente Med. Ctr.*
159 Cal. App. 4th 463 (2008) ..................................................................................... 20

*Brown v. Colm*
11 Cal. 3d, 639 (1974) ............................................................................................... 3

*Collins v. Texas*
223 U.S. 288 (1912) ................................................................................................. 14

*Conant v. Walters*
309 F.3d 629 (9th Cir. 2002) ............................................................................... 12, 13

*Dent v. West Virginia*
129 U.S. 114 (1889) ............................................................................................ 15, 18

*Doe v. Harris*
772 F.3d 563 (9th Cir. 2014) ..................................................................................... 20

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014) ................................................................................... 22

*Eastman v. State*
10 N.E. 97 (Ind. 1887) ............................................................................................. 14

*Ettinger v. Board of Med. Quality Assurance*
135 Cal. App. 3d 853 (1982) ..................................................................................... 21

*Flowers v. Torrance Mem. Hosp. Med. Ctr.*
8 Cal. 4th 992 (1994) ................................................................................................ 3

*Frisby v. Schultz*
487 U.S. 474 (1988) ................................................................................................. 18

*Fuller v. Bd. of Med. Exam'rs*
14 Cal. App. 2d 734 (1936) ......................................................................................... 2

*Garcia v. Google. Inc.*
786 F.3d 733 (9th Cir. 2015) ....................................................................................... 6

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Goldfarb v. Virginia State Bar*
421 U.S. 773 (1975) ............................................................................................................. 17

*Gore v. Board of Med. Quality Assurance*
110 Cal. App. 3d 184 (1980) .................................................................................................. 3

*Hill v. Colorado*
530 U.S. 703 (2000) ............................................................................................................. 21

*Kearl v. Board of Med. Quality Assurance*
189 Cal. App. 3d 1040 (1986) ................................................................................................ 3

*Kenneally v. Medical Board*
27 Cal. App. 4th 489 (1994) ................................................................................................ 15

*Klein v. San Clemente*
584 F.3d 1196 (9th Cir. 2009) ............................................................................................... 6

*Kolender v. Lawson*
461 U.S. 352 (1983) ............................................................................................................. 19

*Laird v. Tatum*
408 U.S. 1 (1972) ................................................................................................................. 10

*Lambert v. Yellowley*
272 U.S. 581 (1926) ............................................................................................................. 14

*Lewis v. Superior Court*
3 Cal. 5th 561 (2017) .......................................................................................................... 16

*Lopez v. Candaele*
630 F.3d 775 (9th Cir. 2010) ................................................................................................. 9

*Maryland v. King*
567 U.S. 1301 (2013) .......................................................................................................... 22

*Mazurek v. Armstrong*
520 U.S. 968 (1997) .............................................................................................................. 6

*McDonald v. Lawson*
No. 22-cv-1895, ECF No. 66 (C.D. Cal. Nov. 21, 2022) ...................................................... 9

*Nat'l Institute of Family & Life Advocates v. Becerra*
138 S. Ct. 2361 (2018) .................................................................................................. 10, 14

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Olsen v. Idaho State Bd. of Med.*
  363 F.3d 916 (9th Cir. 2004) ................................................................ 10

4

5

*Pickup v. Brown*
  740 F.3d 1208 (9th Cir. 2014) ............................................. 11, 12, 13, 20

6

*Recht v. Morrisey*
  32 F.4th 398 (4th Cir. 2022) ................................................................ 16

7

8

*Reed v. Town of Gilbert*
  576 U.S. 155 (2015) ............................................................................ 16

9

*Roman Catholic Diocese of Brooklyn v. Cuomo*
  141 S. Ct. 63 (2020) ............................................................................ 17

10

11

*State ex rel. Powell v. State Med. Examining Bd.*
  20 N.W. 238 (Minn. 1884) .................................................................. 14

12

13

*Susan B. Anthony List v. Driehaus*
  573 U.S. 149 (2014) .............................................................................. 6

14

*Tingley v. Ferguson*
  47 F.4th 1055 (9th Cir. 2022) ....................................................... *passim*

15

16

*Town of Chester v. Laroe Estates, Inc.*
  137 S. Ct. 1645 (2017) .......................................................................... 6

17

18

*Trowbridge v. United States*
  703 F. Supp. 2d 1129 (D. Idaho 2010) ................................................ 20

19

*Truman v. Thomas*
  27 Cal. 3d 285 (1980) .................................................................... 15, 16

20

21

*Tunkle v. Regents of the Univ. of California*
  60 Cal. 2d 92 (1963) ............................................................................. 3

22

23

*Valle del Sol, Inc. v. Whiting*
  732 F.3d 1006 (9th Cir. 2013) ............................................................. 19

24

*Watson v. Maryland*
  218 U.S. 173 (1910) ............................................................................ 17

25

26

*Winter v. Natural Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ............................................................................ 6, 22

27

28

iv

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Wollschlaeger v. Governor of Florida*
   848 F.3d 1293 (11th Cir. 2017)........................................................................ 13

4

**STATUTES**

5

Ala. Code § 34-24-360 ...................................................................................... 11

6

California Business and Professions Code

7

   § 741(a)(1) ......................................................................................................... 11

8

   § 741(a)(2) ......................................................................................................... 11
   § 2001.1 ............................................................................................................... 2

9

   § 2004 .................................................................................................................. 2

10

   § 2220(a) ............................................................................................................. 2
   § 2234 .................................................................................................................. 2

11

   § 2234(b) ....................................................................................................... 3, 23
   § 2234(c) ........................................................................................................ 3, 23

12

   § 2234(d) ................................................................................................... 2, 3, 23
   § 2234(e) ............................................................................................................. 2

13

   § 2234.1(a) ....................................................................................................... 11
   § 2236 .................................................................................................................. 3

14

   § 2241.5(c)(5) ................................................................................................... 11

15

   § 2241.5(c)(6) ................................................................................................... 11
   § 2249(a) ............................................................................................................. 3

16

   § 2250 .................................................................................................................. 2
   § 2266 .................................................................................................................. 2

17

18

1876 Cal. Stat., ch. 518
   § 1 ....................................................................................................................... 2

19

   § 10 ..................................................................................................................... 2

20

2022 Cal. Stat., ch. 938 (Assembly Bill 2098)........................................... *passim*

21

   § 1(a) ................................................................................................................... 4
   § 1(b) ................................................................................................................... 4

22

   § 1(d) ............................................................................................................. 4, 17
   § 1(e) ................................................................................................................... 4

23

   § 1(f) ................................................................................................................... 4
   § 2(a) ................................................................................................. 5, 7, 11, 20

24

   § 2(b)(2) .............................................................................................................. 5

25

   § 2(b)(3) ............................................................................................ 5, 7, 11, 20
   § 2(b)(4) ............................................................................................ 5, 7, 11, 20

26

Nev. Rev. Stat. § 630.304 ............................................................................... 11

27

Or. Rev. Stat. § 677.190 ................................................................................. 11

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

**CONSTITUTIONAL PROVISIONS**

4

United States Constitution

5
Article III........................................................................................................ 6
First Amendment.......................................................................... *passim*

6
Fourteenth Amendment........................................................... 1, 5, 19, 21

7

**OTHER AUTHORITIES**

8

CACI 501 ..................................................................................................... 20

9

Robert Post, "Informed Consent to Abortion: A First Amendment Analysis of
Compelled Physician Speech," 2007 U. Ill. L. Rev. 939 (2007) .......................................... 11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Motion for a Preliminary Injunction (2:22-cv-01980-WBS-AC)

**INTRODUCTION**

Assembly Bill (AB) 2098 is a limited but important statute. The California Legislature enacted AB 2098 to address concerns about the spread of disinformation and misinformation about COVID-19 and COVID-19 vaccines by doctors, which has placed lives at serious risk. AB 2098 applies *only* to statements by doctors to their patients as part of their medical treatment and that fall below the standard of care. It leaves untouched any other speech by doctors, including research studies, published works, policy memoranda, and public debates. And it does not impact any advice or treatment that contradicts mainstream opinion but falls within the range of treatment that complies with the requisite standard of care. The statute therefore fits well within the traditional regulation of medicine while still leaving room for experimentation and development in medicine.

Plaintiffs are doctors who contend that AB 2098 violates their First Amendment rights and is unduly vague under the Fourteenth Amendment. They seek a preliminary injunction against the enforcement of AB 2098. But plaintiffs have not carried their burden of demonstrating they are entitled to that extraordinary remedy. For one, plaintiffs have not shown a likelihood of succeeding in their suit. As a threshold matter, plaintiffs lack standing because they identify no particular advice, care, or treatment they want to provide to their patients that would contravene AB 2098. In any event, AB 2098 is permissible under the First Amendment as a regulation of physician-provided care and is not impermissibly vague. Nor have plaintiffs demonstrated any irreparable harm that would result from allowing AB 2098 to go into effect or that the equities and public interest favor an injunction, since AB 2098 only protects patients from receiving inaccurate medical advice or substandard care. This Court should deny the motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      REGULATION OF MEDICINE IN CALIFORNIA**

California has long regulated the practice of medicine for the protection of the public. *See, e.g.*, *Arnett v. Dal Cielo*, 14 Cal. 4th 4, 7 (1996). Since at least 1876, California has regulated the practice of medicine by imposing a licensing and training requirement on medical practitioners.

1  *See* 1876 Cal. Stats., ch. 518, p. 792, § 1.[1]  The 1876 Act also permitted licenses to be refused or

2  revoked for unprofessional conduct.  *Id.*, § 10.  Thus, "[s]ince the earliest days of regulation," the

3  State has sought to "protect the public against incompetent, impaired, or negligent physicians,

4  and, to that end," regulators have "been vested with the power to revoke medical licenses on

5  grounds of unprofessional conduct."  *Arnett*, 14 Cal. 4th at 7.  And since the earliest days, such

6  unprofessional conduct has encompassed, in some circumstances, a practitioner's speech to

7  patients.  *E.g.*, *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 740-41 (1936), *abrogated on*

8  *other grounds* (upholding sanctions on physician who made false claims about his ability to treat

9  hernias).

10      Today, the practice of medicine is regulated primarily by the Medical Board of California

11  (Board), which regulates physicians and surgeons by issuing or denying licenses, imposing

12  discipline for unprofessional conduct, and enforcing the Medical Practice Act (MPA).  Cal. Bus.

13  & Prof. Code § 2004; *see also* Prasifka Decl. ¶ 2.  The Board is required to investigate all

14  complaints of professional misconduct "from the public, other licensees, from health care

15  facilities or from the board [itself]," including anonymous complaints.  Cal. Bus. & Prof. Code

16  § 2220(a).  The Board must maintain confidentiality during its investigations.  *See* Prasifka Decl.

17  ¶ 4.  In carrying out its duties, the Board's highest priority is the protection of the public.  Cal.

18  Bus. & Prof. Code § 2001.1.

19      California law provides that the Board "shall take action against any licensee who is

20  charged with unprofessional conduct."  Cal. Bus. & Prof. Code § 2234.  Section 2234 provides an

21  illustrative list of examples of unprofessional conduct, including: "[t]he commission of any act

22  involving dishonesty or corruption that is substantially related to the qualifications, functions, or

23  duties of a physician and surgeon" and incompetence.  *Id.* § 2234(d), (e).  Other sections of

24  California law provide additional specific examples of unprofessional conduct, such as: failing to

25  maintain adequate and accurate records, *id.* § 2266; failing to obtain proper informed consent

26  prior to a sterilization procedure, *id.* § 2250; failing to provide a standardized summary describing

27

28      [1] The 1876 Act has been included as Exhibit A to Defendants' Request for Judicial Notice.

2

1   in layperson's terms symptoms and methods of diagnoses for gynecological cancer, *id*. § 2249(a);

2   and conviction of a crime substantially related to the practice of medicine, *id*. § 2236.

3       California law also considers "gross negligence," "repeated negligent acts," and

4   "incompetence" to be unprofessional conduct.  Cal. Bus. & Prof. Code § 2234(b), (c), (d).  "Gross

5   negligence" is defined as "the want of even scant care" or "an extreme departure from the

6   standard of care," *Gore v. Board of Med. Quality Assurance*, 110 Cal. App. 3d 184, 196 (1980)

7   (citation omitted), while negligence is a "simple departure" from the current standard of care,

8   Nuovo Decl. ¶ 4.  The "standard of care" for medical practitioners is that reasonable degree of

9   skill, knowledge, and care in diagnosis and treatment ordinarily possessed and exercised by

10  practitioners under similar circumstances at or about the time in question.  *See, e.g.*, *Flowers v.*

11  *Torrance Mem. Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997-98 (1994).  Typically, the standard of care is

12  established through expert testimony.  *See id.* at 1001.  Incompetence is defined as "an absence of

13  qualification, ability or fitness to perform a prescribed duty or function."  *Kearl v. Board of Med.*

14  *Quality Assurance*, 189 Cal. App. 3d 1040, 1054 (1986) (citation omitted).

15      The standard of care is determined by the medical standard prevailing in the community at

16  the time the medical treatment is rendered.  *See Brown v. Colm*, 11 Cal. 3d, 639, 644-47 (1974).

17  Established law has long rejected the argument that physicians can be relieved of their obligation

18  to comply with the current standard of care because the standard is evolving.  *Tunkle v. Regents of*

19  *the Univ. of California*, 60 Cal. 2d 92, 104 (1963) (holding a patient's waiver of liability in

20  exchange for admission to a charitable research hospital to be void as a matter of public policy

21  despite hospital's claim that the standard of care in a research facility will evolve quickly).

22  Rather, the medical community must be trusted "to treat our ailments and update their

23  recommendations on the governing standard of care" as science and knowledge evolve.  *Tingley*

24  *v. Ferguson*, 47 F.4th 1044, 1081 (9th Cir. 2022).

25  **II.   AB 2098**

26      AB 2098 was enacted against this long history of regulation and the more recent backdrop

27  of the COVID-19 pandemic.  As the Legislature found, "[t]he global spread of . . . COVID-19

28  ha[d] claimed the lives of over 6,000,000 people worldwide, including nearly 90,000

3

1     Californians," at the time of AB 2098's enactment.  2022 Cal. Stat., ch. 938 ("AB 2098"), § 1(a).

2     Thankfully, COVID-19 vaccines have played a critical role in helping to stem the spread of the

3     disease and prevent its severity: the Legislature cited data from the Federal Centers for Disease

4     Control and Prevention showing that "unvaccinated individuals are at a risk of dying from

5     COVID-19 that is 11 times greater than those who are fully vaccinated."  AB 2098, § 1(b); *see*

6     *also* Defendants' Request for Judicial Notice ("RJN"), Ex. B, p. 6.  Yet, as the Legislature

7     recounted, as of July 21, 2022, a quarter of those over age five were not vaccinated.  RJN, Ex. E,

8     p. 3.  The Legislature cited research estimating that "2 million to 12 million people in the US

9     were unvaccinated against COVID-19 because of misinformation or disinformation."  RJN, Ex.

10     E, p. 3; *see also* AB 2098, § 1(d); RJN, Ex. D, p. 4.  Such misinformation includes myths, for

11     instance, that the vaccines contain microchips, would make a person magnetic, or would change

12     someone's DNA.  RJN, Ex. D, p. 4.

13        The Legislature found it particularly concerning that some of this medically inaccurate

14     information came from physicians themselves.  The legislative findings for AB 2098 note that

15     "[m]ajor news outlets have reported that some of the most dangerous propagators of inaccurate

16     information regarding the COVID-19 vaccines are licensed health care professionals."  AB 2098,

17     § 1(e); *see also* RJN, Ex. D, pp. 4-5; Ex. B, p. 7.  This behavior, the Legislature noted, would run

18     contrary to a doctor's "duty to provide their patients with accurate, science-based information."

19     AB 2098, § 1(f).  In addition, as the Legislature explained, "[p]hysicians and healthcare

20     professionals play a critical role in keeping communities healthy," and "[a] physician's

21     recommendation and information sharing will educate and inform decisions made by their

22     patients."  RJN, Ex. D, p. 5.  For this reason, whether a doctor provides accurate information or

23     inaccurate information "will ultimately impact patient's health."  *Id.*

24        As the Legislature noted, doctors already face sanctions for repeated instances of

25     negligence or for even a single instance of gross negligence.  *E.g.*, RJN, Ex. D, p. 6.  Some

26     instances of spreading misinformation about COVID-19 would already arguably fall within these

27     existing provisions, the Legislature explained.  RJN, Ex. B, p. 8.  The Legislature enacted AB

28

2098, however, to "confirm that in California, physicians who disseminate COVID-19 misinformation or disinformation" to their patients would be subject to formal discipline.  *Id.*

AB 2098 provides that "[i]t shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."  AB 2098, § 2(a) (to be codified at Cal. Bus. & Prof. Code § 2270).  It defines "disseminate" as the "conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."  AB 2098, § 2(b)(3).  "Misinformation" is defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."  AB 2098, § 2(b)(4).  And "disinformation" is defined as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead."  AB 2098, § 2(b)(2).

**III.   PLAINTIFFS' CHALLENGE TO AB 2098**

Plaintiffs are five physicians licensed by the Board.  Compl. ¶¶ 4-8.  On November 1, 2022, plaintiffs filed suit against Governor Newsom, Attorney General Rob Bonta, and the members of the Medical Board in their official capacities.  *Id.* ¶¶ 9-11.  They contend that AB 2098 violates their First Amendment rights because it violates their rights to speak freely to patients and offer patients their "unvarnished" opinions.  *Id.* ¶ 125.  They also contend that AB 2098 is void for vagueness under the Fourteenth Amendment.  *Id.* ¶¶ 126-36.

On November 3, 2022, plaintiffs filed the instant motion for a preliminary injunction, seeking to enjoin AB 2098 in its entirety.  In it, plaintiffs contend that because medical science is constantly evolving, the scientific consensus will always lag behind the most recent research.  *E.g.*, Mot. for Prelim. Inj. ("PI Mot.") at 9.  They argue that they should be free to share their personal opinions regarding COVID-19 with patients based on their individualized research and beliefs, without fear of license discipline.  *See* PI Mot. at 8-11.  In support of this argument, plaintiffs provide a number of anecdotal examples where they claim to have been "ahead of the curve" in their medical opinions and were later vindicated by subsequent research.  PI Mot. at 10.

5

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. If a movant fails to establish a likelihood of success, the court generally need not consider the other three factors. *Garcia v. Google. Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Plaintiffs, as the movants here, bear the burden to prove each of these elements. *Klein v. San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). They must do so by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (citation and emphasis omitted)).

**ARGUMENT**

**I.     PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS**

**A.     Plaintiffs Lack Standing**

In order for this Court to have jurisdiction to analyze the merits of this case, plaintiffs must demonstrate standing under Article III of the Constitution. *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Standing requires: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Id.* Plaintiffs bear the burden of establishing all three elements. *Id.*

To demonstrate injury, a plaintiff must make a showing of an injury-in-fact that is actual and concrete, not conjectural or hypothetical. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). For pre-enforcement review, the threat of enforcement must be sufficiently imminent to satisfy this requirement. *Id.* at 158. Neither the mere existence of a proscriptive statute, nor a generalized threat of prosecution suffices. *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022). When determining whether a plaintiff has sufficiently alleged a realistic threat of imminent prosecution, the Ninth Circuit looks to three factors: 1) "whether the plaintiff has

6

1    articulated a 'concrete plan' to violate the law in question," 2) "whether the enforcing authorities

2    have 'communicated a specific warning or threat to initiate proceedings,'" and 3) "whether there

3    is a 'history of past prosecution or enforcement under the challenged statute.'"  *Id.* (citation

4    omitted).

5          Plaintiffs have failed to establish standing under these factors.  First and foremost, plaintiffs

6    have not alleged a "concrete plan" to engage in conduct in violation of AB 2098.  Under AB

7    2098, a doctor engages in unprofessional conduct when they "disseminate" misinformation or

8    disinformation.  AB 2098, § 2(a).  To "disseminate" is to 1) convey information, 2) in the form of

9    *treatment or advice*, 3) to a patient *under the doctor's care.  Id.*, § 2(b)(3).  In other words, AB

10   2098 solely applies to *treatment and advice given to a particular patient under a doctor's care*.

11   Moreover, to violate AB 2098, such information must be: 1) false, 2) contradicted by the

12   scientific consensus, and 3) *contrary to the standard of care.  Id.* § 2(b)(4).  None of plaintiffs'

13   declarations indicate they have engaged or intend to engage in conduct that falls within the scope

14   of AB 2098.  For example:

15         • *Dr. Tracy Høeg*: According to her declaration, Dr. Høeg has testified before Congress

16   about COVID-19 in children, provides epidemiological consulting to Marin County, and has

17   published several studies about COVID-19.  Høeg Decl. ¶¶ 5, 7, 8.  None of this conduct involves

18   providing specific advice or treatment to a particular patient in Dr. Høeg's care, and thus is not

19   within the scope of AB 2098.  And she articulates no concrete plan to engage in conduct within

20   the scope of AB 2098.

21         • *Dr. Ram Duriseti*:  According to his declaration, Dr. Duriseti has cared for patients

22   with COVID-19.  Duriseti Decl. ¶ 5.  However, he clarifies that he has reviewed "hundreds of

23   journal articles on COVID and related topics" and that he has "*never* recommended" the

24   controversial drugs "Ivermectin or Hydroxychloroquine to a COVID patient in opposition to

25   established recommendations at the time."  *Id.* ¶ 11.  While Dr. Duriseti has treated COVID-19

26   patients in the past, for his conduct in the future to fall within the scope of AB 2098 any advice or

27   treatment to his patients would need to be *false, contradicted by contemporary scientific*

28

*consensus, and contrary to the standard of care*.  Nothing in Dr. Durseti's declaration suggests that he has provided, or intends to provide, such treatment.

• *Dr. Azadeh Khatibi*:  According to his declaration, Dr. Khatibi has generally cared for patients with ophthalmological infectiouss diseases, has published articles on infectious diseases, and suffered from a life-threatening condition in the past.  Khatibi Decl. ¶¶ 4-5, 14, 19.  As with the other plaintiffs, none of the activity that Dr. Khatibi alleges involves rendering specific advice or treatment concerning COVID-19 (or receiving such as a patient), and therefore none of it falls within the scope of AB 2098.

• *Dr. Peter Mazolewski*:  According to his declaration, Dr. Mazolewski alleges that he has published various articles, been involved in the changing care standards for appendicitis, and works on emergency surgical patients.  Mazolewski Decl. ¶¶ 3-4.  Again, none of this conduct involves providing advice or treatment to a particular patient concerning COVID-19 such that his conduct might fall within the scope of AB 2098.

• *Dr. Aaron Kheriaty*:  According to his declaration, Dr. Kheriaty has published several books and papers on bioethics and medicine, co-authored ventilator triage guidelines, and served as a general psychiatric consultant.  Kheriaty Decl. ¶¶ 3-4.  As with his other co-plaintiffs, none of this conduct falls within the scope of AB 2098.

Ultimately, none of the plaintiffs allege a concrete plan to engage in conduct arguably within the scope of AB 2098.  Indeed, most of the plaintiffs do not allege that they have *ever* engaged in such conduct.  This failure to provide *any* details suggesting a concrete plan to engage in conduct within the scope of AB 2098 stands in contrast to the level of detail that has been sufficient to demonstrate an actual injury.  In *Tingley*, for instance, the plaintiff's declaration detailed how he had worked with patients for several years providing the very treatment banned under the challenged statute, provided examples of specific patients for whom he had performed such treatments, and established his desire to continue providing that treatment.  47 F.4th at 1067-68.  Here, in contrast, plaintiffs do not identify *any* specific treatment, care, or advice they currently wish to provide to a patient that they believe will be prohibited under AB 2098.  The mere possibility that such circumstances could arise is insufficient to establish standing.

8

The other two factors the Ninth Circuit has laid out also weigh against finding standing here.  As to the second factor—whether there is a threat of enforcement—the Ninth Circuit has recognized that there is little risk of enforcement where, as here, the challenged law "by its terms is not applicable to the plaintiffs," or "the enforcing authority expressly interpreted the challenged law as not applying to the plaintiffs' activities.  *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010).  Nor have plaintiffs pointed to any indication that the *Board* or other relevant *government actors* intend to enforce AB 2098 against them; all they point to are comments by third parties suggesting a third party might file a complaint with the Board.  PI Mot. at 11.  Finally, the third factor—the history of enforcement—admittedly "carries 'little weight' when the challenged law is 'relatively new' and the record contains little information as to its enforcement."  *Tingley*, 47 F.4th at 1069 (citation omitted).  That said, the "sparse enforcement history" here still "weighs against standing."  *Id.*  Particularly given the lack of allegations that plaintiffs intend to engage in conduct within the scope of AB 2098, they have failed to demonstrate an actual injury sufficient for standing.  *See McDonald v. Lawson*, No. 22-cv-1895, ECF No. 66 (C.D. Cal. Nov. 21, 2022) (order dismissing similar challenge to AB 2098 from two doctors for lack of standing).[2]

Plaintiffs' allegations are further insufficient to establish standing because they have not shown the conduct they wish to engage in was previously permissible but no longer would be under AB 2098.  Without AB 2098, it was already unprofessional conduct for a doctor to engage in an act of gross negligence, multiple acts of negligence, or incompetence.  *See supra* at p. 3.  AB 2098's sole change is to make a single incident of ordinary negligence (i.e., treatment below the standard of care) unprofessional conduct when such conduct falls within the scope of AB 2098 (i.e., via a doctor disseminating disinformation or misinformation about COVID-19 to a patient).  Plaintiffs do not maintain, however, that whatever advice they intend to give contrary to the standard of care—and their declarations are silent on precisely what advice that is—would be given only one time or to only one patient such that they face a new liability under AB 2098.  Plaintiffs therefore have not shown any harm to them *from AB 2098*.  In addition to undermining

---

[2] Since the recently-issued decision in the *McDonald* case could not be located on Westlaw, it is included as Exhibit F to Defendants' Request for Judicial Notice.

1   any showing of an actual injury, this further undermines a showing of traceability and

2   redressability.

3        Finally, plaintiffs' general assertion of a chilling effect caused by AB 2098 cannot fill the

4   gap in showing an actual or imminent injury.  *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)

5   ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present

6   objective harm or a threat of specific future harm[.]").  In sum, plaintiffs have no likelihood of

7   succeeding because they lack standing.[3]

8        **B.    Plaintiffs Are Unlikely to Succeed on Their Free Speech Claim**

9        Plaintiffs argue that AB 2098 is unconstitutional because it is a viewpoint-based restriction

10  on speech that does not survive strict scrutiny.  PI Mot. at 15, 20.  In so doing, however, they

11  ignore entirely that States may regulate the conduct and care provided by medical professionals—

12  even if that regulation involves restrictions on speech—without running afoul of the First

13  Amendment.  AB 2098 is such a permissible regulation.  First, AB 2098 is constitutional as a

14  regulation of professional conduct.  Second, even if AB 2098 were considered a regulation of

15  speech rather than professional conduct, it is constitutional as a regulation of the medical care

16  provided by doctors.  Finally, should strict scrutiny apply, AB 2098 would be constitutional even

17  under that standard.

18       **1.    AB 2098 Is a Permissible Regulation of Professional Conduct**

19       Although speech by professionals is protected by the First Amendment, states may still

20  "regulate professional conduct, even though that conduct incidentally involves speech."  *Nat'l*

21  *Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2372 (2018).

22  Regulations of medical practitioners' professional conduct that also touch upon their speech are

23  widespread and longstanding.  They include, for instance, "state regulation of malpractice" and

24  informed consent requirements.  *Tingley*, 47 F.4th at 1074.  "[D]octors are routinely held liable

25  for giving negligent advice to their patients, without serious suggestion that the First Amendment

26

27       [3] Relatedly, the Medical Board Defendants are entitled to absolute immunity for their
     quasi-judicial acts relating to a licensee's disciplinary proceedings. *Olsen v. Idaho State Bd. of*
     *Med.*, 363 F.3d 916, 922-26 (9th Cir. 2004). For this reason, their claims against these defendants

28   would also fail.

10

protects their right to give advice that is not consistent with the accepted standard of care." *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014), *abrogated on other grounds by NIFLA*, 128 S. Ct. 2361.  For instance, "[d]octors commit malpractice for failing to inform patients in a timely way of an accurate diagnosis, for failing to give patients proper instructions, for failing to ask patients necessary questions, or for failing to refer a patient to an appropriate specialist." Robert Post, "Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech," 2007 U. Ill. L. Rev. 939, 950-951 (2007) (compiling cases).  A doctor similarly "may not counsel a patient to rely on quack medicine.  The First Amendment would not prohibit the doctor's loss of license for doing so."  *Pickup*, 740 F.3d at 1228 (citation omitted). California is no different from other states in generally regulating the professional conduct of medical practitioners in ways that implicate their speech but concern the medical care they provide their patients.  *See, e.g.*, Cal. Bus. & Prof. Code § 741(a)(1), (2) (requiring disclosures when prescribing certain high doses of opioids); *id.* § 2234.1(a) (requiring disclosures for complementary or alternative medicine); *id.* § 2241.5(c)(5), (6) (requiring providers prescribing opiates to create certain records); *see also supra* at pp. 2-3.[4]

AB 2098 fits into this longstanding tradition.  It makes it unprofessional conduct for a physician to "disseminate misinformation or disinformation related to COVID-19."  AB 2098, § 2(a).  But this provision does not address physician speech in the abstract; the definitions of "disseminate" and "misinformation" make clear that the prohibition is directed at the *care* that a physician provides her patient.  The statute defines "disseminate" as "the conveyance of information from [a practitioner] *to a patient under the [practitioner's] care* in the *form of treatment or advice*."  *Id.* § 2(b)(3) (emphasis added).  It defines "misinformation" as "false information that is contradicted by contemporary scientific consensus *contrary to the standard of care*."  *Id.* § 2(b)(4) (emphasis added).  AB 2098 thus circumscribes the *care* a physician recommends or provides *to their patients* for a *specific health issue*.  By regulating the care that

---

[4] *See also, e.g.*, Ala. Code § 34-24-360 (doctor may be sanctioned for untruthful statements concerning qualifications or effect of proposed treatment); Nev. Rev. Stat. § 630.304 (doctor may be sanctioned for discouraging second opinion); Or. Rev. Stat. § 677.190 (doctor may be sanctioned for representing an incurable disease can be cured or for making false or misleading statements about the efficacy of a drug or treatment).

physicians provide, AB 2098 is a regulation of professional conduct and the speech incident to such conduct.

AB 2098 is thus analogous to statutes upheld by the Ninth Circuit in *Tingley* and *Pickup* as permissible regulations of professional conduct even though the statutes also impacted physician speech.  In those cases, the Ninth Circuit addressed the validity of state statutes prohibiting conversion therapy—that is, efforts to change a person's sexual orientation—performed on minors.  *See Tingley*, 47 F.4th at 1071-72.  Both statutes regulated professional conduct, the Ninth Circuit concluded, because they regulated the kind of care a practitioner could provide their patients.  The fact that such care was "performed through speech alone" made no difference.  *Pickup*, 740 F.3d at 1230; *see also Tingley*, 47 F.4th at 1077-79.

AB 2098 similarly regulates the kind of care that a physician can provide.  As under the statutes in *Tingley* and *Pickup*, providers remain free under AB 2098 to generally discuss different treatment options for COVID-19, weigh the pros and cons of a patient obtaining a vaccine for COVID-19, provide patients with information that will ensure they receive informed consent, or advise a specific treatment for COVID-19.  They also remain free to conduct research, publish articles, engage in scientific debate, or formulate hospital policies; they face no restrictions under AB 2098 on their ability to express their views on COVID-19 outside the context of treating a patient.  All they must do is act competently within the standards of their profession when they *treat* a patient.  Just as with the statutes banning conversion therapy, this is a regulation of the care a physician gives and thus a regulation of professional conduct.

The Ninth Circuit decision in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), is consistent with this view of physician conduct.  Plaintiffs cite *Conant* for the proposition that the Ninth Circuit has "rejected" the "claim that belonging to a regulated profession requires any diminution of First Amendment rights."  PI Mot. at 15.  But whatever *Conant* says about whether physician speech is generally protectable, it does not hold that states cannot permissibly regulate the *spoken components* of professional *conduct*.  The policy that the Ninth Circuit disproved of in *Conant* involved the federal government investigating a physician "solely on the basis of a recommendation of marijuana within a bona fide doctor-patient relationship."  *Conant*, 309 F.3d

12

1   at 636.  The problem with the government policy at issue was that it sanctioned "doctors who

2   recommend medical marijuana to patients after complying with accepted medical procedures"

3   and who were "acting in their professional role in conformity with the standards of the state

4   where they are licensed to practice medicine."  *Id.* at 647 (Kozinski, J., concurring).  That was

5   distinct from when the state sanctions a doctor who "recommend[ed] marijuana without

6   examining the patient, without conducting tests, without considering the patient's medical history

7   or without otherwise following standard medical procedures."  *Id*.

8       Thus, AB 2098 is clearly distinguishable from the policy at issue in *Conant* because that

9   policy was not targeted at treatment that was below the standard of care.  To the contrary, it

10  precluded a doctor from discussing marijuana use as a possible treatment and from

11  recommending marijuana use when doing so was *consistent* with the standard of care.  *See*

12  *Conant*, 309 F.3d at 637 (prohibiting all discussion of medical use of marijuana); *cf.*

13  *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1317 (11th Cir. 2017) (striking down

14  statute that prohibited doctors from asking certain questions even when consistent with the

15  standard of care and when there was no evidence the prohibited questions were "medically

16  inappropriate, ethically problematic, or potentially ineffective").  Unlike the challenged policy in

17  *Conant*, AB 2098 does not preclude a physician from asking questions to gather information

18  about potential COVID-19 treatment or advice, from discussing the pros and cons of any potential

19  treatment, from recommending a particular treatment, or from providing specific advice—when

20  doing so is consistent with the standard of medical judgment.  It thus minimizes the intrusion into

21  the doctor-patient relationship by solely restricting treatment and advice that fall below the

22  standard of care.  And by generally preserving speech on COVID-19 related subjects when the

23  advice or treatment given is *not* below the standard of care, AB 2098 targets professional *conduct*.

24  It is analogous not to the governmental regulation disapproved of in *Conant* but rather to those

25  held permissible in *Pickup* and *Tingley*.

26      Under *Tingley* and *Pickup*, the applicable standard for reviewing the constitutionality of AB

27  2098's regulation of conduct is rational basis.  *Tingley*, 47 F.4th at 1077.  That standard requires

28  only that AB 2098 "bear[] a rational relationship to a legitimate state interest."  *Pickup*, 740 F.3d

13

at 1231.  AB 2098 readily meets this standard.  As discussed in more detail below, *see infra* at pp. 16-18, AB 2098 furthers the government's interest in public health and patient safety.  The Legislature was concerned that misinformation and disinformation that could dissuade patients from receiving critical or necessary care to prevent COVID-19 (such as vaccinations) or to treat COVID-19 was on occasion being spread by medical professionals in the doctor-patient context. *E.g.*, RJN Ex. C, p. 3; Ex. D, pp. 4-5.  Protecting public health and patient safety is a legitimate state interest.  *See infra* at pp. 16-18.  Recommendations that fall below the standard of care can harm patients individually and public health generally.  Prohibiting doctors from providing inaccurate information in a way that renders their care below the requisite standard of care furthers the State's legitimate interest in patient safety and public health.  AB 2098 is therefore constitutional as a reasonable regulation of professional conduct.

### 2.   AB 2098 Is a Permissible Regulation of the Care Provided by Medical Professionals

Even if the Court were to conclude that AB 2098 is not a regulation of professional conduct, plaintiffs still do not show a likelihood of success on their First Amendment claim. "The Supreme Court has recognized that laws regulating categories of speech belonging to a 'long . . . tradition' of restriction are subject to lesser scrutiny."  *Tingley*, 47 F.4th at 1079 (quoting *NIFLA*, 138 S. Ct. at 2372).  And there is indeed a long tradition of "regulation governing the practice of those who provide health care within state borders."  *Id.* at 1080.  Since the birth of modern medicine, states have imposed restrictions on who can practice medicine and on the care medical practitioners provide.  *See id.* at 1080-81 (discussing, *inter alia*, *Collins v. Texas*, 223 U.S. 288 (1912), and *Lambert v. Yellowley*, 272 U.S. 581 (1926)); *see also, e.g.*, *State ex rel. Powell v. State Med. Examining Bd.*, 20 N.W. 238, 240 (Minn. 1884) (statutes imposing requirements on the right to practice medicine "have been very common").  This has included restrictions on the provision of care that involves the speech of practitioners: "[C]enturies-old medical malpractice laws," for instance, "restrict treatment *and the speech* of health care providers."  *Tingley*, 47 F.4th at 1082 (emphasis added); *see also, e.g.*, *Eastman v. State*, 10 N.E. 97, 97 (Ind. 1887) ("For centuries the law has required physicians to possess and exercise skill

14

1   and learning, for it has mulcted in damages those who pretend to be physicians and surgeons, but

2   have neither learning nor skill.").

3       This history of regulation arises out of important concerns.  "The health professions differ

4   from other licensed professions because they *treat* other humans, and their treatment can result in

5   physical and psychological harm to their patients."  *Tingley*, 47 F.4th at 1083.  "The work of

6   physicians has life and death consequences for their patients."  *Kenneally v. Medical Board*, 27

7   Cal. App. 4th 489, 500 (1994).  While the doctor-patient relationship requires candor, such candor

8   must be counterbalanced by a patient's ability to trust that their doctor is providing them with

9   *competent and adequate care*.  After all, "the knowledge of patient and physician are not in

10  parity," and a patient "has an abject dependence upon and trust in his physician for the

11  information upon which he relies during the decisional process."  *Truman v. Thomas*, 27 Cal. 3d

12  285, 291 (1980) (citation omitted).  While "[e]very one may have occasion to consult" a doctor,

13  "comparatively few can judge of the qualifications of learning and skill which he possesses."

14  *Dent v. West Virginia*, 129 U.S. 114, 122 (1889).  Rather, "[r]eliance must be placed upon the

15  assurance given by his license, issued by an authority competent to judge in that respect, that he

16  possess the requisite qualifications."  *Id.* at 122-23.  Thus, "[w]hen a health care provider acts or

17  speaks about treatment with the authority of a state license, that license is an 'imprimatur of a

18  certain level of competence.'"  *Tingley*, 47 F.4th at 1082 (citation omitted).  Patients need to

19  know that their doctors can be trusted, and regulating the care that medical professionals provide

20  plays a key role in not only protecting health and safety but also in assuring the trust necessary for

21  the doctor-patient relationship to work.  Because medical care frequently involves the provision

22  of professional advice, effective protection for patients must encompass the ability to regulate

23  such speech.

24      AB 2098 cleanly falls within the category of laws recognized as permissible under *Tingley*.

25  The statute solely regulates the advice and treatment physicians provide—and the information

26  conveyed in such advice and treatment—both of which *are* patient care.  *See, e.g.*, *Tingley*, 47

27  F.4th at 1082-83.  It is that context of patient care, and that alone, that AB 2098 regulates.  And

28  AB 2098 does not tell doctors what they must say or require them to say anything at all.  Rather,

to the extent a provider chooses to discuss COVID-19, AB 2098 simply prohibits doing so in a manner that violates the standard of care.  This has long been a requirement for doctors in order to protect their patients.  A contention that California cannot require that much of its medical practitioners would "endanger centuries-old medical malpractice laws that restrict treatment and the speech of healthcare providers." *Tingley*, 47 F.4th at 1082.

### 3.   AB 2098 Withstands Strict Scrutiny

Finally, even if the Court were to conclude that AB 2098 is subject to strict scrutiny, plaintiffs still cannot show a likelihood of success on the merits.  To survive strict scrutiny, a statute must be narrowly tailored to serve a compelling government interest.  *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  AB 2098 meets this standard.

### a.   AB 2098 Furthers a Compelling Government Interest

AB 2098 serves interests that are not only legitimate, but compelling.  First, AB 2098 furthers the State's compelling interest in "protect[ing] patients from negligent or incompetent physicians." *Lewis v. Superior Court*, 3 Cal. 5th 561, 572 (2017).  States "unquestionably ha[ve] a 'compelling interest in assuring safe health care for the public.'" *Recht v. Morrisey*, 32 F.4th 398, 413 (4th Cir. 2022) (citation omitted).  As the Legislature explained, "[p]hysicians and healthcare professionals play a critical role in keeping communities healthy.  A physician's recommendation and information sharing will educate and inform decisions made by their patients." RJN, Ex. D, p. 5; *see also* Nuovo Decl. ¶ 6.  Because medical decisions that patients make under doctor advice are by definition matters of health—and frequently life and death—the State has a compelling interest in ensuring the care provided is not substandard.  This is equally true with respect to COVID-19, where interventions like vaccinations have helped to protect health and save lives. *See supra* at p. 4.  Like malpractice law and other prohibitions on treatment below the standard of care, AB 2098 guards and protects patients' health and safety.

Second, AB 2098 furthers the compelling interest of ensuring patient access to accurate, complete, and truthful information about healthcare.  Misinformation from a doctor during medical treatment presents a real danger of harm to a patient.  Nuovo Decl. ¶ 6; *cf. Truman*, 27 Cal. 3d at 293-94 (patient declined pap smear test when doctor did not explain purpose of test and

16

1    subsequently died of cervical cancer).  In addition to furthering this interest generally, AB 2098

2    does so in a way that also helps limit the spread and severity of the deadly COVID-19 pandemic.

3    The Supreme Court has recognized that "[s]temming the spread of COVID-19 is unquestionably a

4    compelling interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

5    Vaccines have played a crucial role in helping stem the spread of COVID-19 and limiting the

6    severity of the disease.  *See supra* at p. 4.  However, as the Legislature found, "misinformation

7    and disinformation about COVID-19 vaccines"—including misinformation from medical

8    practitioners—have "placed lives at serious risk" by precluding patients from receiving such

9    vaccines due to factually incorrect information.  AB 2098, § 1(d), (e); *see also* RJN, Ex. B., p. 6;

10   Ex. D, p. 4.  While ensuring that patients receive accurate information—as AB 2098 does—is a

11   compelling interest, it is doubly so here, insofar as AB 2098 could also help bolster COVID-19

12   vaccination rates and stem the spread and harm of that disease.

13        Third, AB 2098 furthers the State's "compelling interest in regulating the practice of

14   professions within their boundaries." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975).

15   The Supreme Court has noted that among the professions, "[t]here is perhaps no profession more

16   properly open to [state] regulation than that which embraces the practitioners of medicine,"

17   "dealing as its followers do with the lives and health of the people." *Watson v. Maryland*, 218

18   U.S. 173, 176 (1910); *see also Tingley*, 47 F.4th at 1083 ("'[f]ew professions require more

19   careful' scrutiny than 'that of medicine'" (citation omitted)).  AB 2098, acting in harmony with

20   other similar and long-standing regulations, furthers this compelling interest.  It is critical that

21   patients can trust the medical judgment, advice, and recommendations of their state-licensed

22   medical providers.  Without such trust, patients may well avoid acting on medically appropriate

23   advice and suffer serious, if not life-threatening, health consequences.  This is no less true in the

24   COVID-19 arena than in other areas of health care.  By holding medical practitioners to the

25   standard of care in providing accurate advice and recommendations about COVID-19 to their

26   patients, AB 2098 helps ensure patient trust in their doctors and thereby furthers a compelling

27   government interest.

28        In response, plaintiffs argue that AB 2098 does not further a compelling interest because it

17

1    "jeopardizes the societally and constitutionally recognized, sacred doctor-patient relationship."

2    PI Mot. at 20 (emphasis removed).  Plaintiffs have it exactly backwards.  Rather, as discussed

3    above, ensuring that doctors provide medically accurate information consistent with the standard

4    of care and scientific consensus *strengthens* the doctor-patient relationship by enabling patients to

5    trust that their doctors will not lead them astray or harm them.  Furthermore, to the extent that the

6    State's compelling interest in protecting health and safety is inconsistent with preserving the

7    sanctity of the doctor-patient relationship, protecting health and safety is of greater importance.  It

8    is of critical importance for the State to "secure [patients] against the consequences of [doctors']

9    ignorance and incapacity, as well as of deception and fraud," *Dent*, 129 U.S. at 122, which is

10   precisely what AB 2098 does.

11                    **b.    AB 2098 Is Narrowly Tailored to Serve Those Compelling
                              Interests**

12

13        Finally, plaintiffs provide a cursory argument that AB 2098 is not narrowly tailored, *see* PI

14   Mot. at 20, but the statute meets the requirements for such tailoring.  "A statute is narrowly

15   tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."

16   *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  Here, the Legislature's primary concern in enacting

17   AB 2098 was to stop the provision of inaccurate or incorrect information about COVID-19 to

18   patients in a way that renders medical treatment below the standard of care.  The Legislature

19   recounted evidence of medical practitioners spreading such misinformation.  *See, e.g.*, RJN Ex. B,

20   pp. 6-7; Ex. D, pp. 4-5.  It explained that doctors play a key role in guiding patient decisions

21   about healthcare, making it particularly concerning when they violate the standard of care by

22   failing to provide medically accurate information.  *See, e.g.*, RJN, Ex. B, pp. 6-7; Ex. D, pp. 4-5.

23   The Legislature acted to limit this harm in the narrowest possible way: by clarifying that when

24   doctors provide advice or treatment about COVID-19, they must adhere to the standard of care.

25   AB 2098 leaves practitioners free to express themselves in innumerable other forums outside of

26   patient care.  And within the context of patient care, it does not limit advice that meets the

27   standard of care.  *See supra* at p. 13 (distinguishing AB 2098 from policy at issue in *Conant*).

28   Nor does it prevent speech outside the context of patient care, such as debates at conferences,

                                                      18

1    medical research, or published articles.  It thus specifically targets the precise category of conduct

2    or speech where the State's interest is highest and that poses the greatest risk of harm: conduct or

3    speech by doctors that comes in the form of advice or treatment to patients within their care.[5]

4         Considering AB 2098's place within the larger system of medical regulation also reinforces

5    its narrow tailoring.  As the legislative history notes, doctors are already subject to discipline for

6    repeated negligent acts, gross negligence, or incompetence.  RJN, Ex. B, p. 8; *see also supra* at p.

7    3.  Thus, a physician who repeatedly provides treatment or guidance concerning COVID-19 that

8    falls below the requisite standard of care—or a physician who does so only once in a manner

9    constituting gross negligence or incompetence—already faces the possibility of discipline or

10   liability.  All that AB 2098 does is clarify that, with respect to advice and treatment concerning

11   COVID-19, a single instance of substandard care can suffice for discipline.  That clarification is

12   narrowly tailored to further the State's compelling interests in public health and patient safety.

13        **C.    Plaintiffs Are Unlikely to Succeed on Their Void for Vagueness Claim**

14        Plaintiffs further argue that AB 2098 is unconstitutional under the Fourteenth Amendment

15   because it is void for vagueness.  In so doing, they fixate solely on the statutory phrase

16   "contradicted by the contemporary scientific consensus."  PI Mot. at 22.  But when the statute is

17   viewed as a whole, it is not unconstitutional for vagueness.

18        A statute is impermissibly vague when it "fails to provide a reasonable opportunity to know

19   what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory

20   enforcement."  *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted).  But "[d]ue

21   process does not require 'impossible standards of clarity'."  *Id.* (quoting *Kolender v. Lawson*, 461

22   U.S. 352, 361 (1983)).  All that is required is for the statute "to give 'a person of ordinary

23   intelligence a reasonable opportunity to know what is prohibited.'"  *Valle del Sol, Inc. v. Whiting*,

24   732 F.3d 1006, 1019 (9th Cir. 2013) (citation omitted).  And where a statute "regulates

25   _____

26        [5] That AB 2098 is narrowly tailored is further illustrated by looking to the legislative
     history of the enactment.  As originally introduced, AB 2098 did not include a definition of
27   "dissemination."  RJN, Ex. B, p. 12.  The statute was amended to include a definition of
     "disseminate" that clarified the statute was targeted at "communications made to a patient under
28   [the provider's] care in the form of treatment or advice" and not to "statements made to the
     general public about COVID-19 through social media or at a public protest."  *Id.*

                                              19

1    licensed . . . health providers, who constitute 'a select group of persons having specialized

2    knowledge,' the standard for clarity is lower." *Pickup*, 740 F.4th at 1234 (citation omitted).

3        AB 2098 meets this standard. It defines as unprofessional conduct a physician

4    "disseminat[ing] misinformation or disinformation related to COVID-19." AB 2098, § 2(a). The

5    statutory definitions of the relevant terms provide adequate context and guidance for a

6    practitioner of ordinary intelligence to know what is prohibited. Under AB 2098, "dissemination"

7    is defined as "the conveyance of information from the licensee to a patient under the licensee's

8    care in the form of treatment or advice." AB 2098, § 2(b)(3). This clarifies that the type of

9    behavior implicated by AB 2098 involves: 1) conveying information, 2) in the form of treatment

10    or advice, 3) to a patient under the practitioner's care. A practitioner of ordinary intelligence can

11    distinguish between the situations covered by this provision (e.g., providing advice to one's

12    patient about whether to receive the COVID-19 vaccines) from those that are not (e.g., publishing

13    a journal in a scientific article about the effectiveness of the COVID-19 vaccines).

14        AB 2098 in turn defines "misinformation" as "false information that is contradicted by

15    contemporary scientific consensus contrary to the standard of care." AB 2098, § 2(b)(4). This

16    language imposes at least two requirements for conduct to fall within the scope of AB 2098: that

17    it is 1) contradicted by the contemporary scientific consensus *and* 2) contrary to the standard of

18    care.[6] This second requirement, in particular, is far from unduly vague. The term "standard of

19    care" is not only familiar to medical practitioners but is used pervasively in the legal and medical

20    regulatory systems. *E.g.*, CACI 501 (jury instruction stating that a medical practitioner who fails

21    to use the standard of care is negligent); *Avivi v. Centro Medico Urgente Med. Ctr.*, 159 Cal. App.

22    4th 463, 469-70 (2008) (describing standard of care in medical malpractice suit); *Trowbridge v.*

23    *United States*, 703 F. Supp. 2d 1129, 1137-40 (D. Idaho 2010) (discussing factual findings as to

24    standard of care in medical malpractice suit). Indeed, California's medical licensing system holds

25        [6] To the extent the Court believes there is a lack of clarity on this point, defendants
26    contend the Court should adopt the narrower construction of the statute's reading. *See, e.g., Doe*
    *v. Harris*, 772 F.3d 563, 578 (9th Cir. 2014) (court may adopt narrowing construction of statute in
27    vagueness challenge). Such a reading of the statutory text is consistent with the legislative
    history, which indicates that the definition of "misinformation" was amended expressly to
28    connect it to the standard of care. RJN, Ex. D, p. 10. Requiring that any false information be
    contrary to the standard of care as a distinct element carries out that purpose.

20

1   licensees to the standard of care with respect to *all* the care they provide.  *See supra* at p. 3.  No

2   reasonable medical practitioner would be unsure what it means to provide advice or treatment that

3   is "contrary to the standard of care."

4        The phrase "contradicted by contemporary scientific consensus" is similarly not unduly

5   vague.  There may be issues open to debate within the scientific and medical communities, but

6   that does not mean there are not objectively provable facts on which the scientific community has

7   a consensus: that apples contain sugar, that measles is caused by a virus, that Down syndrome is

8   caused by a chromosomal abnormality, etc.  To the extent there are instances where the scientific

9   consensus is less clear—just as it can be difficult at times to prove what the relevant standard of

10  care is—that does not make the statute unduly vague.  Rather, when a scientific consensus does

11  not exist, that makes the statute *inapplicable* under its own terms.  Furthermore, in a disciplinary

12  hearing, the burden of proof would be on the Board to establish all elements of a charge of

13  disseminating misinformation, and where that does not happen, no discipline can occur.  *Ettinger*

14  *v. Board of Med. Quality Assurance*, 135 Cal. App. 3d 853, 856 (1982).  In any event, there is no

15  danger of this term leading to confusion about whether doctors should provide certain

16  information.  Misinformation can lead to discipline under the statute not only if it is contradicted

17  by the scientific consensus *but also* if it is contrary to the standard of care.  Thus, plaintiffs and all

18  medical practitioners know that if their treatment and advice falls within the standard of care, they

19  are not in violation of AB 2098.  Ultimately, all that the Fourteenth Amendment requires is that it

20  be "clear what the [statute] as a whole prohibits."  *Hill v. Colorado*, 530 U.S. 703, 733 (2000)

21  (citation omitted).  AB 2098 meets that standard.  Plaintiffs therefore have not established a

22  likelihood of success on their Fourteenth Amendment claim either.

23  **II.   THE REMAINING FACTORS WEIGH AGAINST INJUNCTIVE RELIEF**

24       First, plaintiffs have failed to demonstrate any irreparable harm.  In their brief, they contend

25  that they suffer irreparable harm because of a loss of constitutional rights.  PI Opp. at 23.  As

26  explained above, however, AB 2098 is a constitutional statute.  *See supra* at pp. 10-21.

27       Second, the balance of equities and public interest do not favor injunctive relief.  Where, as

28  here, the government is the opposing party, the last two factors of the preliminary injunction

1  analysis—the balance of equities and public interest—merge.  *Drakes Bay Oyster Co. v. Jewell*,

2  747 F.3d 1073, 1092 (9th Cir. 2014).  To analyze these factors, the Court "balance[s] the

3  competing claims of injury" and "consider[s] the effect of granting or withholding the requested

4  relief," paying "particular regard for the public consequences in employing the extraordinary

5  remedy of injunction."  *Winter*, 555 U.S. at 24 (citation omitted).

6       Here, the State has a strong interest in enforcing AB 2098's obligations to protect the public

7  and would suffer irreparable harm if enjoined from doing so.  *Maryland v. King*, 567 U.S. 1301,

8  1303 (2013) ("[A]nytime a State is enjoined by a court from effectuating statutes enacted by

9  representatives of its people, it suffers a form of irreparable injury.") (internal quotation marks

10 omitted).  In addition, an injunction here would undermine the State's long tradition of regulating

11 physician conduct.  *See Tingley*, 47 F.4th at 1079-81.  California has an indisputable and

12 substantial public interest in ensuring the effective regulation and operation of the medical

13 practice to ensure the health and safety of patients and the public.  That is especially true here,

14 where AB 2098 serves to ensure that patients receive accurate and medically appropriate

15 information and that doctors do not provide patients with substandard care.  And since such care

16 can involve the vaccinations against COVID-19 that have played a critical role in reducing the

17 severity and spread of the disease, an injunction could also undermine the public health.

18      Plaintiff's argument that the public interest is better served by permitting them free reign to

19 give medical advice to their patients based on their individual research without regard to the

20 prevailing scientific consensus or standard of care is unavailing.  Regardless of whether plaintiffs'

21 claim that their minority views will one day become the mainstream is mere vanity or actual

22 genius, physicians are required to follow the standard of care as it exists at the time that they

23 provide the care.  *See* Nuovo Decl. § 3.  And there is no basis to think that simply because a view

24 may be contrary to the mainstream, it is automatically beyond the standard of care; in any given

25 situation, there may be a number of treatments or advice a doctor can give a patient that, whether

26 in accordance with the mainstream or not, still fall within the standard of care.  AB 2098 only

27 prohibits those *outside* the standard of care.  In addition, as AB 2098 also requires that

28 misinformation be "false", if plaintiffs can establish the actual truthfulness of their minority views

22

1    during the course of a Board investigation or disciplinary proceeding, they would not be subject

2    to AB 2098.

3        Although plaintiffs allege deprivations of their constitutional rights, any actual burden on

4    those rights that might exist (and defendants contend there is none) is incidental and exceedingly

5    minimal.  State law already defines incompetence, a single instance of gross negligence, or

6    repeated negligent acts as unprofessional conduct —regulations not challenged by plaintiffs in

7    this case.  Cal. Bus. & Prof. Code § 2234(b), (c), (d).  All AB 2098 does is clarify that a single

8    instance of negligence with respect to the treatment and care provided to a patient can constitute

9    unprofessional conduct, if that care involves misinformation or disinformation about COVID-19.

10    Any incremental impact on speech—particularly speech that comes in the form of advice or

11    treatment below the standard of care—is far outweighed by the State's compelling interest in

12    ensuring that doctors provide adequate care for the protection and safety of their patients and the

13    public.

14                         **CONCLUSION**

15        This Court should deny Plaintiffs' motion for a preliminary injunction.

16

17    Dated:  December 12, 2022                Respectfully submitted,

18                                  ROB BONTA
                                 Attorney General of California

19                                  STEVE DAHL
                                 ANYA M. BINSACCA

20                                  Supervising Deputy Attorneys General
                                 MEGAN O'CARROLL

21                                  Deputy Attorney General

22

23

24                                  */s/ Kristin Liska*

                                 KRISTIN A. LISKA

25                                  Deputy Attorney General
                                 *Attorneys for Defendants*

26

27

28

1

**CERTIFICATE OF SERVICE**

2

Case Name:      ***Hoeg, Tracy, et al. v. Gavin Newsom, et al.***

3

Case No.        **2:22-cv-01980-WBS-AC**

4

I hereby certify that on <u>December 12, 2022</u>, I electronically filed the following documents

5

with the Clerk of the Court by using the CM/ECF system:

6

- **OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION**

7

- **DECLARATION OF JAMES NUOVO, M.D. IN SUPPORT OF DEFENDANTS'**

8

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (with EXHIBIT 1)**

9

- **DECLARATION OF WILLIAM PRASIFKA, EXECUTIVE DIRECTOR OF**

10

**THE MEDICAL BOARD OF CALIFORNIA, IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

11

- **REQUEST FOR JUDICIAL NOTICE (with EXHIBITS A-G)**

12

I certify that **all** participants in the case are registered CM/ECF users and that service will

13

be electronically accomplished by the CM/ECF system.

14

I declare under penalty of perjury under the laws of the State of California and the United

15

States of America the foregoing is true and correct.

16

Executed on <u>December 12, 2022</u>, at San Francisco, California.

17

18

_____            _____
Vanessa Jordan                             *Vanessa Jordan*
Declarant                                     Signature

19

20

21

22

23

24

25

26

27

28